# UNITED STATES *v.* LOPEZ

No. 93–1260.   Argued November 8, 1994—Decided April 26, 1995

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 568. THOMAS, J., filed a concurring opinion, *post*, p. 584. STEVENS, J., *post*, p. 602, and SOUTER, J., *post*, p. 603, filed dissenting opinions. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 615.

*Solicitor General Days* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Harris, Deputy Solicitor General Wallace, Malcolm L. Stewart,* and *John F. De Pue.*

*John R. Carter* argued the cause for respondent. With him on the brief were *Lucien B. Campbell, Henry J. Bemporad, Carter G. Phillips,* and *Adam D. Hirsh.**

---

*Briefs of *amici curiae* urging reversal were filed for 16 Members of the United States Senate et al. by *Debra A. Valentine, Brady C. Williamson,* and *Jeffrey J. Kassel;* for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, *John P. Ware,* Assistant Attorney General, *Richard A. Cordray,* State Solicitor, *Simon B. Karas, G. Oliver Koppell,* Attorney General of New York, and *Vanessa Ruiz;* for the Center to Prevent Handgun Violence et al. by *Erwin N. Griswold, Dennis A. Henigan,* and *Gail A. Robinson;* for Children NOW et al. by *William F. Abrams;* for the Clarendon Foundation by *Ronald D. Maines;* for the Coalition to Stop Gun Violence et al. by *Brian J. Benner;* and for the National School Safety Center et al. by *James A. Rapp.*

Briefs of *amici curiae* urging affirmance were filed for the National Conference of State Legislatures et al. by *Richard Ruda* and *Barry Friedman;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Anthony T. Caso.*

Briefs of *amici curiae* were filed for Academics for the Second Amendment et al. by *Patrick J. Basial, Don B. Kates, Robert Carter, Henry Mark Holzer, Nicholas J. Johnson, Joseph E. Olson, Daniel Polsby, Charles E. Rice, Wallace Rudolph, Justin Smith, Robert B. Smith, George Strickler, Richard Warner,* and *Robert Weisberg;* and for the Texas Justice Foundation by *Clayton Trotter.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In the Gun-Free School Zones Act of 1990, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U. S. C. § 922(q)(1)(A) (1988 ed., Supp. V). The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress "[t]o regulate Commerce . . . among the several States . . . ." U. S. Const., Art. I, § 8, cl. 3.

On March 10, 1992, respondent, who was then a 12th-grade student, arrived at Edison High School in San Antonio, Texas, carrying a concealed .38-caliber handgun and five bullets. Acting upon an anonymous tip, school authorities confronted respondent, who admitted that he was carrying the weapon. He was arrested and charged under Texas law with firearm possession on school premises. See Tex. Penal Code Ann. § 46.03(a)(1) (Supp. 1994). The next day, the state charges were dismissed after federal agents charged respondent by complaint with violating the Gun-Free School Zones Act of 1990. 18 U. S. C. § 922(q)(1)(A) (1988 ed., Supp. V).[1]

A federal grand jury indicted respondent on one count of knowing possession of a firearm at a school zone, in violation of § 922(q). Respondent moved to dismiss his federal indictment on the ground that § 922(q) "is unconstitutional as it is beyond the power of Congress to legislate control over our public schools." The District Court denied the motion, concluding that § 922(q) "is a constitutional exercise of Congress' well-defined power to regulate activities in and affecting

---

[1] The term "school zone" is defined as "in, or on the grounds of, a public, parochial or private school" or "within a distance of 1,000 feet from the grounds of a public, parochial or private school." § 921(a)(25).

commerce, and the 'business' of elementary, middle and high schools . . . affects interstate commerce." App. to Pet. for Cert. 55a. Respondent waived his right to a jury trial. The District Court conducted a bench trial, found him guilty of violating § 922(q), and sentenced him to six months' imprisonment and two years' supervised release.

On appeal, respondent challenged his conviction based on his claim that § 922(q) exceeded Congress' power to legislate under the Commerce Clause. The Court of Appeals for the Fifth Circuit agreed and reversed respondent's conviction. It held that, in light of what it characterized as insufficient congressional findings and legislative history, "section 922(q), in the full reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause." 2 F. 3d 1342, 1367–1368 (1993). Because of the importance of the issue, we granted certiorari, 511 U. S. 1029 (1994), and we now affirm.

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See Art. I, § 8. As James Madison wrote: "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory* v. *Ashcroft*, 501 U. S. 452, 458 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8,

cl. 3. The Court, through Chief Justice Marshall, first defined the nature of Congress' commerce power in *Gibbons* v. *Ogden*, 9 Wheat. 1, 189–190 (1824):

> "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Id.*, at 196. The *Gibbons* Court, however, acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.

> "It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
>
> "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. . . . The enumeration presupposes something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State." *Id.*, at 194–195.

For nearly a century thereafter, the Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power, and almost entirely with the Commerce Clause as a limit on state legislation that discriminated against interstate commerce. See, *e. g., Veazie* v. *Moor*, 14 How. 568, 573–575 (1853) (upholding a state-created steamboat monop-

oly because it involved regulation of wholly internal commerce); *Kidd* v. *Pearson*, 128 U. S. 1, 17, 20–22 (1888) (upholding a state prohibition on the manufacture of intoxicating liquor because the commerce power "does not comprehend the purely internal domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State"); see also L. Tribe, American Constitutional Law 306 (2d ed. 1988). Under this line of precedent, the Court held that certain categories of activity such as "production," "manufacturing," and "mining" were within the province of state governments, and thus were beyond the power of Congress under the Commerce Clause. See *Wickard* v. *Filburn*, 317 U. S. 111, 121 (1942) (describing development of Commerce Clause jurisprudence).

In 1887, Congress enacted the Interstate Commerce Act, 24 Stat. 379, and in 1890, Congress enacted the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 *et seq.* These laws ushered in a new era of federal regulation under the commerce power. When cases involving these laws first reached this Court, we imported from our negative Commerce Clause cases the approach that Congress could not regulate activities such as "production," "manufacturing," and "mining." See, *e. g.*, *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12 (1895) ("Commerce succeeds to manufacture, and is not part of it"); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 304 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it"). Simultaneously, however, the Court held that, where the interstate and intrastate aspects of commerce were so mingled together that full regulation of interstate commerce required incidental regulation of intrastate commerce, the Commerce Clause authorized such regulation. See, *e. g.*, *Shreveport Rate Cases*, 234 U. S. 342 (1914).

In *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 550 (1935), the Court struck down regulations that

fixed the hours and wages of individuals employed by an intrastate business because the activity being regulated related to interstate commerce only indirectly. In doing so, the Court characterized the distinction between direct and indirect effects of intrastate transactions upon interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system." *Id.*, at 548. Activities that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly were beyond Congress' reach. *Id.*, at 546. The justification for this formal distinction was rooted in the fear that otherwise "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." *Id.*, at 548.

Two years later, in the watershed case of *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge, and in the process, departed from the distinction between "direct" and "indirect" effects on interstate commerce. *Id.*, at 36–38 ("The question [of the scope of Congress' power] is necessarily one of degree"). The Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. *Id.*, at 37.

In *United States* v. *Darby*, 312 U. S. 100 (1941), the Court upheld the Fair Labor Standards Act, stating:

> "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.*, at 118.

See also *United States* v. *Wrightwood Dairy Co.,* 315 U. S.
110, 119 (1942) (the commerce power "extends to those intra-
state activities which in a substantial way interfere with or
obstruct the exercise of the granted power").

In *Wickard* v. *Filburn,* the Court upheld the application
of amendments to the Agricultural Adjustment Act of 1938
to the production and consumption of homegrown wheat.
317 U. S., at 128–129. The *Wickard* Court explicitly re-
jected earlier distinctions between direct and indirect effects
on interstate commerce, stating:

> "[E]ven if appellee's activity be local and though it may
> not be regarded as commerce, it may still, whatever its
> nature, be reached by Congress if it exerts a substantial
> economic effect on interstate commerce, and this irre-
> spective of whether such effect is what might at some
> earlier time have been defined as 'direct' or 'indirect.' "
> *Id.,* at 125.

The *Wickard* Court emphasized that although Filburn's own
contribution to the demand for wheat may have been trivial
by itself, that was not "enough to remove him from the scope
of federal regulation where, as here, his contribution, taken
together with that of many others similarly situated, is far
from trivial." *Id.,* at 127–128.

*Jones & Laughlin Steel, Darby,* and *Wickard* ushered in
an era of Commerce Clause jurisprudence that greatly ex-
panded the previously defined authority of Congress under
that Clause. In part, this was a recognition of the great
changes that had occurred in the way business was carried
on in this country. Enterprises that had once been local or
at most regional in nature had become national in scope.
But the doctrinal change also reflected a view that earlier
Commerce Clause cases artificially had constrained the au-
thority of Congress to regulate interstate commerce.

But even these modern-era precedents which have ex-
panded congressional power under the Commerce Clause

confirm that this power is subject to outer limits. In *Jones & Laughlin Steel,* the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U. S., at 37; see also *Darby, supra,* at 119–120 (Congress may regulate intrastate activity that has a "substantial effect" on interstate commerce); *Wickard, supra,* at 125 (Congress may regulate activity that "exerts a substantial economic effect on interstate commerce"). Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. See, *e. g., Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 276–280 (1981); *Perez* v. *United States,* 402 U. S. 146, 155–156 (1971); *Katzenbach* v. *McClung,* 379 U. S. 294, 299–301 (1964); *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 252–253 (1964).[2]

Similarly, in *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), the Court reaffirmed that "the power to regulate commerce, though broad indeed, has limits" that "[t]he Court has ample power" to enforce. *Id.,* at 196, overruled on other grounds, *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), overruled by *Garcia* v. *San Antonio Metropolitan Transit*

---

[2] See also *Hodel,* 452 U. S., at 311 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (REHNQUIST, J., concurring in judgment); *Heart of Atlanta Motel,* 379 U. S., at 273 ("[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court") (Black, J., concurring).

*Authority,* 469 U. S. 528 (1985). In response to the dissent's warnings that the Court was powerless to enforce the limitations on Congress' commerce powers because "[a]ll activities affecting commerce, even in the minutest degree, *[Wickard],* may be regulated and controlled by Congress," 392 U. S., at 204 (Douglas, J., dissenting), the *Wirtz* Court replied that the dissent had misread precedent as "[n]either here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," *id.,* at 197, n. 27. Rather, "[t]he Court has said only that where *a general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individual instances arising under that statute is of no consequence." *Ibid.* (first emphasis added).

Consistent with this structure, we have identified three broad categories of activity that Congress may regulate under its commerce power. *Perez, supra,* at 150; see also *Hodel, supra,* at 276–277. First, Congress may regulate the use of the channels of interstate commerce. See, *e. g., Darby,* 312 U. S., at 114; *Heart of Atlanta Motel, supra,* at 256 ("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question'" (quoting *Caminetti* v. *United States,* 242 U. S. 470, 491 (1917))). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, *e. g., Shreveport Rate Cases,* 234 U. S. 342 (1914); *Southern R. Co.* v. *United States,* 222 U. S. 20 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); *Perez, supra,* at 150 ("[F]or example, the destruction of an aircraft (18 U. S. C. § 32), or . . . thefts from interstate shipments (18 U. S. C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those ac-

tivities having a substantial relation to interstate commerce, *Jones & Laughlin Steel,* 301 U. S., at 37, *i. e.,* those activities that substantially affect interstate commerce, *Wirtz, supra,* at 196, n. 27.

Within this final category, admittedly, our case law has not been clear whether an activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. Compare *Preseault* v. *ICC,* 494 U. S. 1, 17 (1990), with *Wirtz, supra,* at 196, n. 27 (the Court has never declared that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities"). We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

We now turn to consider the power of Congress, in the light of this framework, to enact § 922(q). The first two categories of authority may be quickly disposed of: § 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce. Thus, if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce.

First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce. Examples include the regulation of intrastate coal mining; *Hodel, supra,* intrastate extortionate credit transactions, *Perez, supra,* restaurants utilizing substantial interstate supplies, *McClung, supra,* inns and hotels catering to interstate guests, *Heart of Atlanta Motel, supra,* and pro-

duction and consumption of homegrown wheat, *Wickard* v. *Filburn*, 317 U. S. 111 (1942). These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.

Even *Wickard*, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not. Roscoe Filburn operated a small farm in Ohio, on which, in the year involved, he raised 23 acres of wheat. It was his practice to sow winter wheat in the fall, and after harvesting it in July to sell a portion of the crop, to feed part of it to poultry and livestock on the farm, to use some in making flour for home consumption, and to keep the remainder for seeding future crops. The Secretary of Agriculture assessed a penalty against him under the Agricultural Adjustment Act of 1938 because he harvested about 12 acres more wheat than his allotment under the Act permitted. The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained. The Court said, in an opinion sustaining the application of the Act to Filburn's activity:

> "One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market.

Home-grown wheat in this sense competes with wheat in commerce." 317 U. S., at 128.

Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms.[3] Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in *United States* v. *Bass*, 404 U. S. 336 (1971), the Court interpreted former 18 U. S. C. § 1202(a), which made it

---

[3] Under our federal system, the " 'States possess primary authority for defining and enforcing the criminal law.' " *Brecht* v. *Abrahamson*, 507 U. S. 619, 635 (1993) (quoting *Engle* v. *Isaac*, 456 U. S. 107, 128 (1982)); see also *Screws* v. *United States*, 325 U. S. 91, 109 (1945) (plurality opinion) ("Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States"). When Congress criminalizes conduct already denounced as criminal by the States, it effects a " 'change in the sensitive relation between federal and state criminal jurisdiction.' " *United States* v. *Enmons*, 410 U. S. 396, 411–412 (1973) (quoting *United States* v. *Bass*, 404 U. S. 336, 349 (1971)). The Government acknowledges that § 922(q) "displace[s] state policy choices in . . . that its prohibitions apply even in States that have chosen not to outlaw the conduct in question." Brief for United States 29, n. 18; see also Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (Nov. 29, 1990) ("Most egregiously, section [922(q)] inappropriately overrides legitimate State firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by the Congress").

a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce . . . any firearm." 404 U. S., at 337. The Court interpreted the possession component of § 1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *Id.*, at 349. The *Bass* Court set aside the conviction because, although the Government had demonstrated that Bass had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." *Id.*, at 347. The Court thus interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the "mere possession" of firearms. See *id.*, at 339, n. 4; see also *United States* v. *Five Gambling Devices*, 346 U. S. 441, 448 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative"). Unlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, see, *e. g.*, *Preseault* v. *ICC*, 494 U. S., at 17, the Government concedes that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Brief for United States 5–6. We agree with the Government that Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce. See *McClung*, 379 U. S., at 304;

see also *Perez*, 402 U. S., at 156 ("Congress need [not] make particularized findings in order to legislate"). But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.[4]

The Government argues that Congress has accumulated institutional expertise regarding the regulation of firearms through previous enactments. Cf. *Fullilove* v. *Klutznick*, 448 U. S. 448, 503 (1980) (Powell, J., concurring). We agree, however, with the Fifth Circuit that importation of previous findings to justify § 922(q) is especially inappropriate here because the "prior federal enactments or Congressional findings [do not] speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation." 2 F. 3d, at 1366.

The Government's essential contention, *in fine*, is that we may determine here that § 922(q) is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce. Brief for United States 17. The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent

---

[4] We note that on September 13, 1994, President Clinton signed into law the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103–322, 108 Stat. 1796. Section 320904 of that Act, *id.*, at 2125, amends § 922(q) to include congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce. The Government does not rely upon these subsequent findings as a substitute for the absence of findings in the first instance. Tr. of Oral Arg. 25 ("[W]e're not relying on them in the strict sense of the word, but we think that at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity").

crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. See *United States* v. *Evans*, 928 F. 2d 858, 862 (CA9 1991). Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Cf. *Heart of Atlanta Motel*, 379 U. S., at 253. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce.

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr. of Oral Arg. 8–9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

Although JUSTICE BREYER argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not. JUSTICE BREYER posits that there might be some limitations on Con-

gress' commerce power, such as family law or certain aspects of education. *Post*, at 624. These suggested limitations, when viewed in light of the dissent's expansive analysis, are devoid of substance.

JUSTICE BREYER focuses, for the most part, on the threat that firearm possession in and near schools poses to the educational process and the potential economic consequences flowing from that threat. *Post*, at 619–624. Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce. *Post*, at 623. This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, *a fortiori*, it also can regulate the educational process directly. Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning. As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," cf. *ibid.*, and that, in turn, has a substantial effect on interstate commerce.

JUSTICE BREYER rejects our reading of precedent and argues that "Congress . . . could rationally conclude that schools fall on the commercial side of the line." *Post*, at 629. Again, JUSTICE BREYER's rationale lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "fall[ing] on the commercial side of the line" because it provides a "valuable service—namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." *Ibid.* We do not doubt that Congress

has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.

Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender "legal uncertainty." *Post*, at 630. As Chief Justice Marshall stated in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819):

> "Th[e] [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it . . . is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." *Id.*, at 405.

See also *Gibbons* v. *Ogden*, 9 Wheat., at 195 ("The enumeration presupposes something not enumerated"). The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation. See Art. I, § 8. Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the Judiciary's duty "to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) (Marshall, C. J.). Any possible benefit from eliminating this "legal uncertainty" would be at the expense of the Constitution's system of enumerated powers.

In *Jones & Laughlin Steel*, 301 U. S., at 37, we held that the question of congressional power under the Commerce Clause "is necessarily one of degree." To the same effect

is the concurring opinion of Justice Cardozo in *Schechter Poultry:*

> "There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" 295 U. S., at 554 (quoting *United States* v. *A. L. A. Schechter Poultry Corp.*, 76 F. 2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. See *supra,* at 556–558. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, cf. *Gibbons* v. *Ogden, supra,* at 195, and that there never will be a distinction between what is

truly national and what is truly local, cf. *Jones & Laughlin Steel, supra,* at 30.   This we are unwilling to do.

For the foregoing reasons the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring.

The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power.   That history gives me some pause about today's decision, but I join the Court's opinion with these observations on what I conceive to be its necessary though limited holding.

Chief Justice Marshall announced that the national authority reaches "that commerce which concerns more States than one" and that the commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."   *Gibbons* v. *Ogden,* 9 Wheat. 1, 194, 196 (1824).   His statements can be understood now as an early and authoritative recognition that the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise.   The progression of our Commerce Clause cases from *Gibbons* to the present was not marked, however, by a coherent or consistent course of interpretation; for neither the course of technological advance nor the foundational principles for the jurisprudence itself were self-evident to the courts that sought to resolve contemporary disputes by enduring principles.

Furthermore, for almost a century after the adoption of the Constitution, the Court's Commerce Clause decisions did not concern the authority of Congress to legislate.   Rather,

the Court faced the related but quite distinct question of the authority of the States to regulate matters that would be within the commerce power had Congress chosen to act. The simple fact was that in the early years of the Republic, Congress seldom perceived the necessity to exercise its power in circumstances where its authority would be called into question. The Court's initial task, therefore, was to elaborate the theories that would permit the States to act where Congress had not done so. Not the least part of the problem was the unresolved question whether the congressional power was exclusive, a question reserved by Chief Justice Marshall in *Gibbons* v. *Ogden, supra,* at 209–210.

At the midpoint of the 19th century, the Court embraced the principle that the States and the National Government both have authority to regulate certain matters absent the congressional determination to displace local law or the necessity for the Court to invalidate local law because of the dormant national power. *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots,* 12 How. 299, 318–321 (1852). But the utility of that solution was not at once apparent, see generally F. Frankfurter, The Commerce Clause under Marshall, Taney and Waite (1937) (hereinafter Frankfurter), and difficulties of application persisted, see *Leisy* v. *Hardin,* 135 U. S. 100, 122–125 (1890).

One approach the Court used to inquire into the lawfulness of state authority was to draw content-based or subject-matter distinctions, thus defining by semantic or formalistic categories those activities that were commerce and those that were not. For instance, in deciding that a State could prohibit the in-state manufacture of liquor intended for out-of-state shipment, it distinguished between manufacture and commerce. "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactur[e] and commerce. Manufacture is transformation—the fashioning of raw mate-

rials into a change of form for use. The functions of commerce are different." *Kidd* v. *Pearson*, 128 U. S. 1, 20 (1888). Though that approach likely would not have survived even if confined to the question of a State's authority to enact legislation, it was not at all propitious when applied to the quite different question of what subjects were within the reach of the national power when Congress chose to exercise it.

This became evident when the Court began to confront federal economic regulation enacted in response to the rapid industrial development in the late 19th century. Thus, it relied upon the manufacture-commerce dichotomy in *United States* v. *E. C. Knight Co.*, 156 U. S. 1 (1895), where a manufacturers' combination controlling some 98% of the Nation's domestic sugar refining capacity was held to be outside the reach of the Sherman Act. Conspiracies to control manufacture, agriculture, mining, production, wages, or prices, the Court explained, had too "indirect" an effect on interstate commerce. *Id.*, at 16. And in *Adair* v. *United States*, 208 U. S. 161 (1908), the Court rejected the view that the commerce power might extend to activities that, although local in the sense of having originated within a single State, nevertheless had a practical effect on interstate commercial activity. The Court concluded that there was not a "legal or logical connection . . . between an employé's membership in a labor organization and the carrying on of interstate commerce," *id.*, at 178, and struck down a federal statute forbidding the discharge of an employee because of his membership in a labor organization. See also *The Employers' Liability Cases*, 207 U. S. 463, 497 (1908) (invalidating statute creating negligence action against common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce").

Even before the Court committed itself to sustaining federal legislation on broad principles of economic practicality, it found it necessary to depart from these decisions. The Court disavowed *E. C. Knight's* reliance on the manufacturing-commerce distinction in *Standard Oil Co. of N. J.* v. *United States,* 221 U. S. 1, 68–69 (1911), declaring that approach "unsound." The Court likewise rejected the rationale of *Adair* when it decided, in *Texas & New Orleans R. Co.* v. *Railway Clerks,* 281 U. S. 548, 570–571 (1930), that Congress had the power to regulate matters pertaining to the organization of railroad workers.

In another line of cases, the Court addressed Congress' efforts to impede local activities it considered undesirable by prohibiting the interstate movement of some essential element. In the *Lottery Case,* 188 U. S. 321 (1903), the Court rejected the argument that Congress lacked power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit. See also *Hipolite Egg Co.* v. *United States,* 220 U. S. 45 (1911); *Hoke* v. *United States,* 227 U. S. 308 (1913). In *Hammer* v. *Dagenhart,* 247 U. S. 251 (1918), however, the Court insisted that the power to regulate commerce "is directly the contrary of the assumed right to forbid commerce from moving," *id.,* at 269–270, and struck down a prohibition on the interstate transportation of goods manufactured in violation of child labor laws.

Even while it was experiencing difficulties in finding satisfactory principles in these cases, the Court was pursuing a more sustainable and practical approach in other lines of decisions, particularly those involving the regulation of railroad rates. In the *Minnesota Rate Cases,* 230 U. S. 352 (1913), the Court upheld a state rate order, but observed that Congress might be empowered to regulate in this area if "by reason of the interblending of the interstate and intrastate operations of interstate carriers" the regulation of interstate rates could not be maintained without restrictions on "intra-

state rates which substantially affect the former." *Id.*, at 432–433. And in the *Shreveport Rate Cases*, 234 U. S. 342 (1914), the Court upheld an Interstate Commerce Commission order fixing railroad rates with the explanation that congressional authority, "extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." *Id.*, at 351.

Even the most confined interpretation of "commerce" would embrace transportation between the States, so the rate cases posed much less difficulty for the Court than cases involving manufacture or production. Nevertheless, the Court's recognition of the importance of a practical conception of the commerce power was not altogether confined to the rate cases. In *Swift & Co.* v. *United States*, 196 U. S. 375 (1905), the Court upheld the application of federal antitrust law to a combination of meat dealers that occurred in one State but that restrained trade in cattle "sent for sale from a place in one State, with the expectation that they will end their transit . . . in another." *Id.*, at 398. The Court explained that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Ibid.* Chief Justice Taft followed the same approach in upholding federal regulation of stockyards in *Stafford* v. *Wallace*, 258 U. S. 495 (1922). Speaking for the Court, he rejected a "nice and technical inquiry," *id.*, at 519, when the local transactions at issue could not "be separated from the movement to which they contribute," *id.*, at 516.

Reluctance of the Court to adopt that approach in all of its cases caused inconsistencies in doctrine to persist, however. In addressing New Deal legislation the Court resuscitated

the abandoned abstract distinction between direct and indirect effects on interstate commerce. See *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 309 (1936) (Act regulating price of coal and wages and hours for miners held to have only "secondary and indirect" effect on interstate commerce); *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 368 (1935) (compulsory retirement and pension plan for railroad carrier employees too "remote from any regulation of commerce as such"); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 548 (1935) (wage and hour law provision of National Industrial Recovery Act had "no direct relation to interstate commerce").

The case that seems to mark the Court's definitive commitment to the practical conception of the commerce power is *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), where the Court sustained labor laws that applied to manufacturing facilities, making no real attempt to distinguish *Carter, supra,* and *Schechter, supra.* 301 U. S., at 40–41. The deference given to Congress has since been confirmed. *United States* v. *Darby,* 312 U. S. 100, 116–117 (1941), overruled *Hammer* v. *Dagenhart, supra.* And in *Wickard* v. *Filburn,* 317 U. S. 111 (1942), the Court disapproved *E. C. Knight* and the entire line of direct-indirect and manufacture-production cases, explaining that "broader interpretations of the Commerce Clause [were] destined to supersede the earlier ones," 317 U. S., at 122, and "[w]hatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution," *id.*, at 123, n. 24. Later examples of the exercise of federal power where commercial transactions were the subject of regulation include *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241 (1964), *Katzenbach* v. *McClung,* 379 U. S. 294 (1964), and *Perez* v. *United States,* 402 U. S. 146 (1971). These and like authorities are within the fair ambit

of the Court's practical conception of commercial regulation and are not called in question by our decision today.

The history of our Commerce Clause decisions contains at least two lessons of relevance to this case. The first, as stated at the outset, is the imprecision of content-based boundaries used without more to define the limits of the Commerce Clause. The second, related to the first but of even greater consequence, is that the Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point. *Stare decisis* operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. That fundamental restraint on our power forecloses us from reverting to an understanding of commerce that would serve only an 18th-century economy, dependent then upon production and trading practices that had changed but little over the preceding centuries; it also mandates against returning to the time when congressional authority to regulate undoubted commercial activities was limited by a judicial determination that those matters had an insufficient connection to an interstate system. Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.

In referring to the whole subject of the federal and state balance, we said this just three Terms ago:

> "This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses: first, because the Framers would not have conceived that any government would conduct such activities; and second, because the Framers would not have believed that the Federal Government, rather than the States, would assume such

responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role." *New York* v. *United States,* 505 U. S. 144, 157 (1992) (emphasis deleted).

It does not follow, however, that in every instance the Court lacks the authority and responsibility to review congressional attempts to alter the federal balance. This case requires us to consider our place in the design of the Government and to appreciate the significance of federalism in the whole structure of the Constitution.

Of the various structural elements in the Constitution, separation of powers, checks and balances, judicial review, and federalism, only concerning the last does there seem to be much uncertainty respecting the existence, and the content, of standards that allow the Judiciary to play a significant role in maintaining the design contemplated by the Framers. Although the resolution of specific cases has proved difficult, we have derived from the Constitution workable standards to assist in preserving separation of powers and checks and balances. See, *e. g., Prize Cases,* 2 Black 635 (1863); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952); *United States* v. *Nixon,* 418 U. S. 683 (1974); *Buckley* v. *Valeo,* 424 U. S. 1 (1976); *INS* v. *Chadha,* 462 U. S. 919 (1983); *Bowsher* v. *Synar,* 478 U. S. 714 (1986); *Plaut* v. *Spendthrift Farm, Inc., ante,* p. 211. These standards are by now well accepted. Judicial review is also established beyond question, *Marbury* v. *Madison,* 1 Cranch 137 (1803), and though we may differ when applying its principles, see, *e. g., Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992), its legitimacy is undoubted. Our role in preserving the federal balance seems more tenuous.

There is irony in this, because of the four structural elements in the Constitution just mentioned, federalism was the unique contribution of the Framers to political science and political theory. See Friendly, Federalism: A Foreword, 86

Yale L. J. 1019 (1977); G. Wood, The Creation of the American Republic, 1776–1787, pp. 524–532, 564 (1969). Though on the surface the idea may seem counterintuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961) (J. Madison). See also *Gregory* v. *Ashcroft*, 501 U. S. 452, 458–459 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. . . . In the tension between federal and state power lies the promise of liberty"); *New York* v. *United States, supra,* at 181 ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power'") (quoting *Coleman* v. *Thompson,* 501 U. S. 722, 759 (1991) (Blackmun, J., dissenting)).

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the Federal and State Governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of

the two governments to hold accountable for the failure to perform a given function. "Federalism serves to assign political responsibility, not to obscure it." *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 636 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. Cf. *New York* v. *United States, supra,* at 155–169; *FERC* v. *Mississippi,* 456 U. S. 742, 787 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part). The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power.

To be sure, one conclusion that could be drawn from The Federalist Papers is that the balance between national and state power is entrusted in its entirety to the political process. Madison's observation that "the people ought not surely to be precluded from giving most of their confidence where they may discover it to be most due," The Federalist No. 46, p. 295 (C. Rossiter ed. 1961), can be interpreted to say that the essence of responsibility for a shift in power from the State to the Federal Government rests upon a political judgment, though he added assurance that "the State governments could have little to apprehend, because it is only within a certain sphere that the federal power can, in the nature of things, be advantageously administered," *ibid.* Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance.

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance. In the Webster-Hayne Debates, see The Great Speeches and

Orations of Daniel Webster 227–272 (E. Whipple ed. 1879), and the debates over the Civil Rights Acts, see Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., pts. 1–3 (1963), some Congresses have accepted responsibility to confront the great questions of the proper federal balance in terms of lasting consequences for the constitutional design. The political branches of the Government must fulfill this grave constitutional obligation if democratic liberty and the federalism that secures it are to endure.

At the same time, the absence of structural mechanisms to require those officials to undertake this principled task, and the momentary political convenience often attendant upon their failure to do so, argue against a complete renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, see *Public Citizen* v. *Department of Justice,* 491 U. S. 440, 466 (1989); *Rostker* v. *Goldberg,* 453 U. S. 57, 64 (1981), the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

In the past this Court has participated in maintaining the federal balance through judicial exposition of doctrines such as abstention, see, *e. g., Younger* v. *Harris,* 401 U. S. 37 (1971); *Railroad Comm'n of Tex.* v. *Pullman Co.,* 312 U. S. 496 (1941); *Burford* v. *Sun Oil Co.,* 319 U. S. 315 (1943), the rules for determining the primacy of state law, see, *e. g., Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), the doctrine of adequate and independent state grounds, see, *e. g., Murdock* v. *Memphis,* 20 Wall. 590 (1875); *Michigan* v. *Long,* 463 U. S. 1032 (1983), the whole jurisprudence of pre-emption, see, *e. g., Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218 (1947); *Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504 (1992), and many of the rules governing our habeas jurisprudence, see, *e. g., Coleman* v. *Thompson,* 501 U. S. 722 (1991); *McCleskey*

v. *Zant,* 499 U. S. 467 (1991); *Teague* v. *Lane,* 489 U. S. 288 (1989); *Rose* v. *Lundy,* 455 U. S. 509 (1982); *Wainwright* v. *Sykes,* 433 U. S. 72 (1977).

Our ability to preserve this principle under the Commerce Clause has presented a much greater challenge. See *supra,* at 568–574. "This clause has throughout the Court's history been the chief source of its adjudications regarding federalism," and "no other body of opinions affords a fairer or more revealing test of judicial qualities." Frankfurter 66–67. But as the branch whose distinctive duty it is to declare "what the law is," *Marbury* v. *Madison,* 1 Cranch, at 177, we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines. The substantial element of political judgment in Commerce Clause matters leaves our institutional capacity to intervene more in doubt than when we decide cases, for instance, under the Bill of Rights even though clear and bright lines are often absent in the latter class of disputes. See *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 630 (1989) (O'CONNOR, J., concurring in part and concurring in judgment) ("We cannot avoid the obligation to draw lines, often close and difficult lines" in adjudicating constitutional rights). But our cases do not teach that we have no role at all in determining the meaning of the Commerce Clause.

Our position in enforcing the dormant Commerce Clause is instructive. The Court's doctrinal approach in that area has likewise "taken some turns." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc., ante,* at 180. Yet in contrast to the prevailing skepticism that surrounds our ability to give meaning to the explicit text of the Commerce Clause, there is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States. One element of our dormant Commerce Clause jurisprudence has been the principle that the States may not

impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses. See *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573, 579 (1986) (citing *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970)). Distinguishing between regulations that do place an undue burden on interstate commerce and regulations that do not depends upon delicate judgments. True, if we invalidate a state law, Congress can in effect overturn our judgment, whereas in a case announcing that Congress has transgressed its authority, the decision is more consequential, for it stands unless Congress can revise its law to demonstrate its commercial character. This difference no doubt informs the circumspection with which we invalidate an Act of Congress, but it does not mitigate our duty to recognize meaningful limits on the commerce power of Congress.

The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required. As THE CHIEF JUSTICE explains, unlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. See *ante,* at 559–561. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.

An interference of these dimensions occurs here, for it is well established that education is a traditional concern of the States. *Milliken* v. *Bradley,* 418 U. S. 717, 741–742 (1974);

*Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968). The proximity to schools, including of course schools owned and operated by the States or their subdivisions, is the very premise for making the conduct criminal. In these circumstances, we have a particular duty to ensure that the federal-state balance is not destroyed. Cf. *Rice, supra,* at 230 ("[W]e start with the assumption that the historic police powers of the States" are not displaced by a federal statute "unless that was the clear and manifest purpose of Congress"); *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 146 (1963).

While it is doubtful that any State, or indeed any reasonable person, would argue that it is wise policy to allow students to carry guns on school premises, considerable disagreement exists about how best to accomplish that goal. In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear. See *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 49–50 (1973); *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting).

If a State or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of the States are sufficient to enact those measures. Indeed, over 40 States already have criminal laws outlawing the possession of firearms on or near school grounds. See, *e. g.,* Alaska Stat. Ann. §§ 11.61.195(a)(2)(A), 11.61.220(a)(4)(A) (Supp. 1994); Cal. Penal Code Ann. § 626.9 (West Supp. 1994); Mass. Gen. Laws § 269:10(j) (1992); N. J. Stat. Ann. § 2C:39–5(e) (West Supp. 1994); Va. Code Ann. § 18.2–308.1 (1988); Wis. Stat. § 948.605 (1991–1992).

Other, more practicable means to rid the schools of guns may be thought by the citizens of some States to be preferable for the safety and welfare of the schools those States are

charged with maintaining. See Brief for National Conference of State Legislatures et al. as *Amici Curiae* 26–30 (injection of federal officials into local problems causes friction and diminishes political accountability of state and local governments). These might include inducements to inform on violators where the information leads to arrests or confiscation of the guns, see Lima, Schools May Launch Weapons Hot Line, Los Angeles Times, Ventura Cty. East ed., Jan. 13, 1995, p. B1, col. 5; Reward for Tips on Guns in Tucson Schools, The Arizona Republic, Jan. 7, 1995, p. B2; programs to encourage the voluntary surrender of guns with some provision for amnesty, see Zaidan, Akron Rallies to Save Youths, The Plain Dealer, Mar. 2, 1995, p. 1B; Swift, Legislators Consider Plan to Get Guns Off Streets, Hartford Courant, Apr. 29, 1992, p. A4; penalties imposed on parents or guardians for failure to supervise the child, see, *e. g.*, Okla. Stat., Tit. 21, §858 (Supp. 1995) (fining parents who allow students to possess firearm at school); Tenn. Code Ann. §39–17–1312 (Supp. 1992) (misdemeanor for parents to allow student to possess firearm at school); Straight Shooter: Gov. Casey's Reasonable Plan to Control Assault Weapons, Pittsburgh Post-Gazette, Mar. 14, 1994, p. B2 (proposed bill); Bailey, Anti-Crime Measures Top Legislators' Agenda, Los Angeles Times, Orange Cty. ed., Mar. 7, 1994, p. B1, col. 2 (same); Krupa, New Gun-Control Plans Could Tighten Local Law, The Boston Globe, June 20, 1993, p. 29; laws providing for suspension or expulsion of gun-toting students, see, *e. g.*, Ala. Code §16–1–24.1 (Supp. 1994); Ind. Code §20–8.1–5–4(b)(1)(D) (1993); Ky. Rev. Stat. Ann. §158.150(1)(a) (Michie 1992); Wash. Rev. Code §9.41.280 (1994), or programs for expulsion with assignment to special facilities, see Martin, Legislators Poised to Take Harsher Stand on Guns in Schools, The Seattle Times, Feb. 1, 1995, p. B1 (automatic year-long expulsion for students with guns and intense semester-long reentry program).

The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. See U. S. Dept. of Education, National Center for Education Statistics, Digest of Education Statistics 73, 104 (NCES 94–115, 1994) (Tables 63, 94). Each of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property. In some communities no doubt it would be difficult to navigate without infringing on those zones. Yet throughout these areas, school officials would find their own programs for the prohibition of guns in danger of displacement by the federal authority unless the State chooses to enact a parallel rule.

This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. *New York* v. *United States*, 505 U. S. 144 (1992), or to organize its governmental functions in a certain way, cf. *FERC* v. *Mississippi*, 456 U. S., at 781 (O'CONNOR, J., concurring in judgment in part and dissenting in part). While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.

For these reasons, I join in the opinion and judgment of the Court.

JUSTICE THOMAS, concurring.

The Court today properly concludes that the Commerce Clause does not grant Congress the authority to prohibit gun possession within 1,000 feet of a school, as it attempted to do in the Gun-Free School Zones Act of 1990, Pub. L. 101–647, 104 Stat. 4844. Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent case law and is more faithful to the original understanding of that Clause.

We have said that Congress may regulate not only "Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3, but also anything that has a "substantial effect" on such commerce. This test, if taken to its logical extreme, would give Congress a "police power" over all aspects of American life. Unfortunately, we have never come to grips with this implication of our substantial effects formula. Although we have supposedly applied the substantial effects test for the past 60 years, we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power. See *New York* v. *United States*, 505 U. S. 144, 155 (1992) ("[N]o one disputes the proposition that '[t]he Constitution created a Federal Government of limited powers'") (quoting *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991); *Maryland* v. *Wirtz*, 392 U. S. 183, 196 (1968); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37 (1937). Cf. *Chisholm* v. *Georgia*, 2 Dall. 419, 435 (1793) (Iredell, J.) ("Each State in the Union is sovereign as to all the powers reserved. It must necessarily be so, because the United States have no claim to any authority but such as the States have surrendered to them") (emphasis deleted). Indeed, on this crucial point, the majority and JUSTICE BREYER agree in principle: The Federal

Government has nothing approaching a police power. Compare *ante*, at 556–558, with *post*, at 624.

While the principal dissent concedes that there are limits to federal power, the sweeping nature of our current test enables the dissent to argue that Congress can regulate gun possession. But it seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to the individual States, notwithstanding these activities' effects on interstate commerce. Any interpretation of the Commerce Clause that even suggests that Congress could regulate such matters is in need of reexamination.

In an appropriate case, I believe that we must further reconsider our "substantial effects" test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting our more recent Commerce Clause jurisprudence.

Today, however, I merely support the Court's conclusion with a discussion of the text, structure, and history of the Commerce Clause and an analysis of our early case law. My goal is simply to show how far we have departed from the original understanding and to demonstrate that the result we reach today is by no means "radical," see *post*, at 602 (STEVENS, J., dissenting). I also want to point out the necessity of refashioning a coherent test that does not tend to "obliterate the distinction between what is national and what is local and create a completely centralized government." *Jones & Laughlin Steel Corp., supra*, at 37.

## I

At the time the original Constitution was ratified, "commerce" consisted of selling, buying, and bartering, as well as transporting for these purposes. See 1 S. Johnson, A Dic-

tionary of the English Language 361 (4th ed. 1773) (defining commerce as "Intercour[s]e; exchange of one thing for another; interchange of any thing; trade; traffick"); N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789) ("trade or traffic"); T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("Exchange of one thing for another; trade, traffick"). This understanding finds support in the etymology of the word, which literally means "with merchandise." See 3 Oxford English Dictionary 552 (2d ed. 1989) (com—"with"; merci—"merchandise"). In fact, when Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably. See The Federalist No. 4, p. 22 (J. Jay) (asserting that countries will cultivate our friendship when our "trade" is prudently regulated by Federal Government);[1] *id.*, No. 7, at 39–40 (A. Hamilton) (discussing "competitions of commerce" between States resulting from state "regulations of trade"); *id.*, No. 40, at 262 (J. Madison) (asserting that it was an "acknowledged object of the Convention . . . that the regulation of trade should be submitted to the general government"); Lee, Letters of a Federal Farmer No. 5, in Pamphlets on the Constitution of the United States 319 (P. Ford ed. 1888); Smith, An Address to the People of the State of New-York, in *id.*, at 107.

As one would expect, the term "commerce" was used in contradistinction to productive activities such as manufacturing and agriculture. Alexander Hamilton, for example, repeatedly treated commerce, agriculture, and manufacturing as three separate endeavors. See, *e. g.*, The Federalist No. 36, at 224 (referring to "agriculture, commerce, manufactures"); *id.*, No. 21, at 133 (distinguishing commerce, arts, and industry); *id.*, No. 12, at 74 (asserting that commerce and agriculture have shared interests). The same distinctions

---

[1] All references to The Federalist are to the Jacob E. Cooke 1961 edition.

were made in the state ratification conventions. See, *e. g.,* 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 57 (J. Elliot ed. 1836) (hereinafter Debates) (T. Dawes at Massachusetts convention); *id.,* at 336 (M. Smith at New York convention).

Moreover, interjecting a modern sense of commerce into the Constitution generates significant textual and structural problems. For example, one cannot replace "commerce" with a different type of enterprise, such as manufacturing. When a manufacturer produces a car, assembly cannot take place "with a foreign nation" or "with the Indian Tribes." Parts may come from different States or other nations and hence may have been in the flow of commerce at one time, but manufacturing takes place at a discrete site. Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles.

The Port Preference Clause also suggests that the term "commerce" denoted sale and/or transport rather than business generally. According to that Clause, "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U. S. Const., Art. I, § 9, cl. 6. Although it is possible to conceive of regulations of manufacturing or farming that prefer one port over another, the more natural reading is that the Clause prohibits Congress from using its commerce power to channel commerce through certain favored ports.

The Constitution not only uses the word "commerce" in a narrower sense than our case law might suggest, it also does not support the proposition that Congress has authority over all activities that "substantially affect" interstate commerce. The Commerce Clause[2] does not state that Congress may

---

[2] Even to speak of "the Commerce Clause" perhaps obscures the actual scope of that Clause. As an original matter, Congress did not have authority to regulate all commerce; Congress could only "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3. Although the precise line between

"regulate matters that substantially affect commerce with foreign Nations, and among the several States, and with the Indian Tribes." In contrast, the Constitution itself temporarily prohibited amendments that would "affect" Congress' lack of authority to prohibit or restrict the slave trade or to enact unproportioned direct taxation. Art. V. Clearly, the Framers could have drafted a Constitution that contained a "substantially affects interstate commerce" Clause had that been their objective.

In addition to its powers under the Commerce Clause, Congress has the authority to enact such laws as are "necessary and proper" to carry into execution its power to regulate commerce among the several States. U. S. Const., Art. I, § 8, cl. 18. But on this Court's understanding of congressional power under these two Clauses, many of Congress' other enumerated powers under Art. I, § 8, are wholly superfluous. After all, if Congress may regulate all matters that substantially affect commerce, there is no need for the Constitution to specify that Congress may enact bankruptcy laws, cl. 4, or coin money and fix the standard of weights and measures, cl. 5, or punish counterfeiters of United States coin and securities, cl. 6. Likewise, Congress would not need the separate authority to establish post offices and post roads, cl. 7, or to grant patents and copyrights, cl. 8, or to "punish Piracies and Felonies committed on the high Seas," cl. 10. It might not even need the power to raise and support an Army and Navy, cls. 12 and 13, for fewer people would engage in commercial shipping if they thought that a foreign power could expropriate their property with ease. Indeed, if Congress could regulate matters that substantially affect interstate commerce, there would have been no need to spec-

interstate/foreign commerce and purely intrastate commerce was hard to draw, the Court attempted to adhere to such a line for the first 150 years of our Nation. See *infra,* at 593–599.

ify that Congress can regulate international trade and commerce with the Indians. As the Framers surely understood, these other branches of trade substantially affect interstate commerce.

Put simply, much if not all of Art. I, § 8 (including portions of the Commerce Clause itself), would be surplusage if Congress had been given authority over matters that substantially affect interstate commerce. An interpretation of cl. 3 that makes the rest of § 8 superfluous simply cannot be correct. Yet this Court's Commerce Clause jurisprudence has endorsed just such an interpretation: The power we have accorded Congress has swallowed Art. I, § 8.[3]

Indeed, if a "substantial effects" test can be appended to the Commerce Clause, why not to every other power of the Federal Government? There is no reason for singling out the Commerce Clause for special treatment. Accordingly, Congress could regulate all matters that "substantially affect" the Army and Navy, bankruptcies, tax collection, expenditures, and so on. In that case, the Clauses of § 8 all mutually overlap, something we can assume the Founding Fathers never intended.

Our construction of the scope of congressional authority has the additional problem of coming close to turning the Tenth Amendment on its head. Our case law could be read to reserve to the United States all powers not expressly *prohibited* by the Constitution. Taken together, these fundamental textual problems should, at the very least, convince us that the "substantial effects" test should be reexamined.

---

[3] There are other powers granted to Congress outside of Art. I, § 8, that may become wholly superfluous as well due to our distortion of the Commerce Clause. For instance, Congress has plenary power over the District of Columbia and the territories. See U. S. Const., Art. I, § 8, cl. 17, and Art. IV, § 3, cl. 2. The grant of comprehensive legislative power over certain areas of the Nation, when read in conjunction with the rest of the Constitution, further confirms that Congress was not ceded plenary authority over the *whole* Nation.

## II

The exchanges during the ratification campaign reveal the relatively limited reach of the Commerce Clause and of federal power generally. The Founding Fathers confirmed that most areas of life (even many matters that would have substantial effects on commerce) would remain outside the reach of the Federal Government. Such affairs would continue to be under the exclusive control of the States.

Early Americans understood that commerce, manufacturing, and agriculture, while distinct activities, were intimately related and dependent on each other—that each "substantially affected" the others. After all, items produced by farmers and manufacturers were the primary articles of commerce at the time. If commerce was more robust as a result of federal superintendence, farmers and manufacturers could benefit. Thus, Oliver Ellsworth of Connecticut attempted to convince farmers of the benefits of regulating commerce. "Your property and riches depend on a ready demand and generous price for the produce you can annually spare," he wrote, and these conditions exist "where trade flourishes and when the merchant can freely export the produce of the country" to nations that will pay the highest price. A Landholder No. 1, Connecticut Courant, Nov. 5, 1787, in 3 Documentary History of the Ratification of the Constitution 399 (M. Jensen ed. 1978) (hereinafter Documentary History). See also The Federalist No. 35, at 219 (A. Hamilton) ("[D]iscerning citizens are well aware that the mechanic and manufacturing arts furnish the materials of mercantile enterprise and industry. Many of them indeed are immediately connected with the operations of commerce. They know that the merchant is their natural patron and friend"); id., at 221 ("Will not the merchant . . . be disposed to cultivate . . . the interests of the mechanic and manufacturing arts to which his commerce is so nearly allied?"); A Jerseyman: To the Citizens of New Jersey, Trenton Mercury, Nov. 6, 1787, in 3 Documentary History 147 (noting that agriculture will serve as

a "source of commerce"); Marcus, The New Jersey Journal, Nov. 14, 1787, *id.*, at 152 (both the mechanic and the farmer benefit from the prosperity of commerce). William Davie, a delegate to the North Carolina Convention, illustrated the close link best: "Commerce, sir, is the nurse of [agriculture and manufacturing]. The merchant furnishes the planter with such articles as he cannot manufacture himself, and finds him a market for his produce. Agriculture cannot flourish if commerce languishes; they are mutually dependent on each other." 4 Debates 20.

Yet, despite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns:

> "The administration of private justice between the citizens of the same State, the supervision of agriculture and of other concerns of a similar nature, all those things in short which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." The Federalist No. 17, at 106.

In the unlikely event that the Federal Government would attempt to exercise authority over such matters, its effort "would be as troublesome as it would be nugatory." *Ibid.*[4]

---

[4] Cf. 3 Debates 40 (E. Pendleton at the Virginia convention) (The proposed Federal Government "does not intermeddle with the local, particular affairs of the states. Can Congress legislate for the state of Virginia? Can [it] make a law altering the form of transferring property, or the rule of descents, in Virginia?"); *id.*, at 553 (J. Marshall at the Virginia convention) (denying that Congress could make "laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state"); The Federalist No. 33, at 206 (A. Hamilton) (denying that Congress could change laws of descent or could pre-empt a land tax); A Native of Virginia: Observations upon the Proposed Plan of Federal Government, Apr. 2, 1788, in 9 Documentary History 692 (States have sole authority over "rules of property").

592

The comments of Hamilton and others about federal power reflected the well-known truth that the new Government would have only the limited and enumerated powers found in the Constitution. See, e. g., 2 Debates 267–268 (A. Hamilton at New York Convention) (noting that there would be just cause for rejecting the Constitution if it would enable the Federal Government to "alter, or abrogate . . . [a State's] civil and criminal institutions [or] penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals"); The Federalist No. 45, at 313 (J. Madison); 3 Debates 259 (J. Madison) (Virginia Convention); R. Sherman & O. Ellsworth, Letter to Governor Huntington, Sept. 26, 1787, in 3 Documentary History 352; J. Wilson, Speech in the State House Yard, Oct. 6, 1787, in 2 id., at 167–168. Agriculture and manufacture, since they were not surrendered to the Federal Government, were state concerns. See The Federalist No. 34, at 212–213 (A. Hamilton) (observing that the "internal encouragement of agriculture and manufactures" was an object of state expenditure). Even before the passage of the Tenth Amendment, it was apparent that Congress would possess only those powers "herein granted" by the rest of the Constitution. Art. I, § 1.

. Where the Constitution was meant to grant federal authority over an activity substantially affecting interstate commerce, the Constitution contains an enumerated power over that particular activity. Indeed, the Framers knew that many of the other enumerated powers in § 8 dealt with matters that substantially affected interstate commerce. Madison, for instance, spoke of the bankruptcy power as being "intimately connected with the regulation of commerce." The Federalist No. 42, at 287. Likewise, Hamilton urged that "[i]f we mean to be a commercial people or even to be secure on our Atlantic side, we must endeavour as soon as possible to have a navy." Id., No. 24, at 157.

In short, the Founding Fathers were well aware of what the principal dissent calls " 'economic . . . realities.' " See

*post*, at 625 (BREYER, J.) (quoting *North American Co.* v. *SEC*, 327 U. S. 686, 705 (1946)). Even though the boundary between commerce and other matters may ignore "economic reality" and thus seem arbitrary or artificial to some, we must nevertheless respect a constitutional line that does not grant Congress power over all that substantially affects interstate commerce.

## III

If the principal dissent's understanding of our early case law were correct, there might be some reason to doubt this view of the original understanding of the Constitution. According to that dissent, Chief Justice Marshall's opinion in *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), established that Congress may control all local activities that "significantly affect interstate commerce," *post*, at 615. And, "with the exception of one wrong turn subsequently corrected," this has been the "traditiona[l]" method of interpreting the Commerce Clause. *Post*, at 631 (citing *Gibbons* and *United States* v. *Darby*, 312 U. S. 100, 116–117 (1941)).

In my view, the dissent is wrong about the holding and reasoning of *Gibbons*. Because this error leads the dissent to characterize the first 150 years of this Court's case law as a "wrong turn," I feel compelled to put the last 50 years in proper perspective.

## A

In *Gibbons*, the Court examined whether a federal law that licensed ships to engage in the "coasting trade" preempted a New York law granting a 30-year monopoly to Robert Livingston and Robert Fulton to navigate the State's waterways by steamship. In concluding that it did, the Court noted that Congress could regulate "navigation" because "[a]ll America . . . has uniformly understood, the word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed." 9 Wheat., at 190. The Court also ob-

served that federal power over commerce "among the several States" meant that Congress could regulate commerce conducted partly within a State. Because a portion of interstate commerce and foreign commerce would almost always take place within one or more States, federal power over interstate and foreign commerce necessarily would extend into the States. *Id.*, at 194–196.

At the same time, the Court took great pains to make clear that Congress could *not* regulate commerce "which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." *Id.*, at 194. Moreover, while suggesting that the Constitution might not permit States to regulate interstate or foreign commerce, the Court observed that "[i]nspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State" were but a small part "of that immense mass of legislation . . . not surrendered to a general government." *Id.*, at 203. From an early moment, the Court rejected the notion that Congress can regulate everything that affects interstate commerce. That the internal commerce of the States and the numerous state inspection, quarantine, and health laws had substantial effects on interstate commerce cannot be doubted. Nevertheless, they were not "surrendered to the general government."

Of course, the principal dissent is not the first to misconstrue *Gibbons.* For instance, the Court has stated that *Gibbons* "described the federal commerce power with a breadth never yet exceeded." *Wickard* v. *Filburn,* 317 U. S. 111, 120 (1942). See also *Perez* v. *United States,* 402 U. S. 146, 151 (1971) (claiming that with *Darby* and *Wickard,* "the broader view of the Commerce Clause announced by Chief Justice Marshall had been restored"). I believe that this misreading stems from two statements in *Gibbons.*

First, the Court made the uncontroversial claim that federal power does not encompass *"commerce"* that "does

not extend to or affect other States." 9 Wheat., at 194 (emphasis added). From this statement, the principal dissent infers that whenever an activity affects interstate commerce, it necessarily follows that Congress can regulate such activities. Of course, Chief Justice Marshall said no such thing and the inference the dissent makes cannot be drawn.

There is a much better interpretation of the "affect[s]" language: Because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce. Commerce that did not affect another State could *never* be said to be commerce "among the several States."

But even if one were to adopt the dissent's reading, the "affect[s]" language, at most, permits Congress to regulate only intrastate *commerce* that substantially affects interstate and foreign commerce. There is no reason to believe that Chief Justice Marshall was asserting that Congress could regulate *all* activities that affect interstate commerce. See *ibid.*

The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:

> "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Id.*, at 195.

In this passage, the Court merely was making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters to the States. The Court was *not* saying that whatever Congress believes is a national matter becomes an object of federal control. The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on. See generally Art. I, § 8. *Gibbons'* emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Commerce Clause as granting Congress control over matters that "affect the States generally."[5] *Gibbons* simply cannot be construed as the principal dissent would have it.

## B

I am aware of no cases prior to the New Deal that characterized the power flowing from the Commerce Clause as sweepingly as does our substantial effects test. My review of the case law indicates that the substantial effects test is but an innovation of the 20th century.

Even before *Gibbons*, Chief Justice Marshall, writing for the Court in *Cohens* v. *Virginia*, 6 Wheat. 264 (1821), noted that Congress had "no general right to punish murder committed within any of the States," *id.*, at 426, and that it was "clear that congress cannot punish felonies generally," *id.*, at 428. The Court's only qualification was that Congress could enact such laws for places where it enjoyed plenary powers—for instance, over the District of Columbia. *Id.*, at 426. Thus, whatever effect ordinary murders, or robbery, or gun possession might have on interstate commerce (or on any

---

[5] None of the other Commerce Clause opinions during Chief Justice Marshall's tenure, which concerned the "dormant" Commerce Clause, even suggested that Congress had authority over all matters substantially affecting commerce. See *Brown* v. *Maryland*, 12 Wheat. 419 (1827); *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245 (1829).

other subject of federal concern) was irrelevant to the question of congressional power.[6]

*United States* v. *Dewitt*, 9 Wall. 41 (1870), marked the first time the Court struck down a federal law as exceeding the power conveyed by the Commerce Clause. In a two-page opinion, the Court invalidated a nationwide law prohibiting all sales of naphtha and illuminating oils. In so doing, the Court remarked that the Commerce Clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States." *Id.*, at 44. The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. *Id.*, at 44–45. See also *License Tax Cases*, 5 Wall. 462, 470–471 (1867) (Congress cannot interfere with the internal commerce and business of a State); *Trade-Mark Cases*, 100 U. S. 82 (1879) (Congress

---

[6] It is worth noting that Congress, in the first federal criminal Act, did not establish nationwide prohibitions against murder and the like. See Act of Apr. 30, 1790, ch. 9, 1 Stat. 112. To be sure, Congress outlawed murder, manslaughter, maiming, and larceny, but only when those acts were either committed on United States territory not part of a State or on the high seas. *Ibid.* See U. S. Const., Art. I, § 8, cl. 10 (authorizing Congress to outlaw piracy and felonies on high seas); Art. IV, § 3, cl. 2 (plenary authority over United States territory and property). When Congress did enact nationwide criminal laws, it acted pursuant to direct grants of authority found in the Constitution. Compare Act of Apr. 30, 1790, *supra*, §§ 1 and 14 (prohibitions against treason and the counterfeiting of U. S. securities), with U. S. Const., Art. I, § 8, cl. 6 (counterfeiting); Art. III, § 3, cl. 2 (treason). Notwithstanding any substantial effects that murder, kidnaping, or gun possession might have had on interstate commerce, Congress understood that it could not establish nationwide prohibitions.

Likewise, there were no laws in the early Congresses that regulated manufacturing and agriculture. Nor was there *any* statute that purported to regulate activities with "substantial effects" on interstate commerce.

cannot regulate internal commerce and thus may not establish national trademark registration).

In *United States* v. *E. C. Knight Co.*, 156 U. S. 1 (1895), this Court held that mere attempts to monopolize the manufacture of sugar could not be regulated pursuant to the Commerce Clause. Raising echoes of the discussions of the Framers regarding the intimate relationship between commerce and manufacturing, the Court declared that "[c]ommerce succeeds to manufacture, and is not a part of it." *Id.*, at 12. The Court also approvingly quoted from *Kidd* v. *Pearson*, 128 U. S. 1, 20 (1888):

> "'No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce . . . . If it be held that the term [commerce] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested . . . with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry.'" *E. C. Knight, supra*, at 14.

If federal power extended to these types of production "comparatively little of business operations and affairs would be left for state control." *Id.*, at 16. See also *Newberry* v. *United States*, 256 U. S. 232, 257 (1921) ("It is settled . . . that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Congress"). Whether or not manufacturing, agriculture, or other matters substantially affected interstate commerce was irrelevant.

As recently as 1936, the Court continued to insist that the Commerce Clause did not reach the wholly internal business of the States. See *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 308 (1936) (Congress may not regulate mine labor because "[t]he relation of employer and employee is a local relation"); see also *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 543–550 (1935) (holding that Congress may not regulate intrastate sales of sick chickens or the labor of employees involved in intrastate poultry sales). The Federal Government simply could not reach such subjects regardless of their effects on interstate commerce.

These cases all establish a simple point: From the time of the ratification of the Constitution to the mid-1930's, it was widely understood that the Constitution granted Congress only limited powers, notwithstanding the Commerce Clause.[7] Moreover, there was no question that activities wholly separated from business, such as gun possession, were beyond the reach of the commerce power. If anything, the "wrong turn" was the Court's dramatic departure in the 1930's from a century and a half of precedent.

IV

Apart from its recent vintage and its corresponding lack of any grounding in the original understanding of the Constitution, the substantial effects test suffers from the further

---

[7] To be sure, congressional power pursuant to the Commerce Clause was alternatively described less narrowly or more narrowly during this 150-year period. Compare *United States* v. *Coombs*, 12 Pet. 72, 78 (1838) (commerce power "extends to such acts, done on land, which interfere with, obstruct, or prevent the due exercise of the power to regulate [interstate and international] commerce" such as stealing goods from a beached ship), with *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 13 (1895) ("Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities . . . may be regulated, but this is because they form part of interstate trade or commerce"). During this period, however, this Court never held that Congress could regulate everything that substantially affects commerce.

flaw that it appears to grant Congress a police power over the Nation. When asked at oral argument if there were *any* limits to the Commerce Clause, the Government was at a loss for words. Tr. of Oral Arg. 5. Likewise, the principal dissent insists that there are limits, but it cannot muster even one example. *Post*, at 624. Indeed, the dissent implicitly concedes that its reading has no limits when it criticizes the Court for "threaten[ing] legal uncertainty in an area of law that . . . seemed reasonably well settled." *Post*, at 630. The one advantage of the dissent's standard is certainty: It is certain that under its analysis everything may be regulated under the guise of the Commerce Clause.

The substantial effects test suffers from this flaw, in part, because of its "aggregation principle." Under so-called "class of activities" statutes, Congress can regulate whole categories of activities that are not themselves either "interstate" or "commerce." In applying the effects test, we ask whether the class of activities *as a whole* substantially affects interstate commerce, not whether any specific activity within the class has such effects when considered in isolation. See *Maryland* v. *Wirtz*, 392 U. S., at 192–193 (if class of activities is "'within the reach of federal power,'" courts may not excise individual applications as trivial) (quoting *Darby*, 312 U. S., at 120–121).

The aggregation principle is clever, but has no stopping point. Suppose all would agree that gun possession within 1,000 feet of a school does not substantially affect commerce, but that possession of weapons generally (knives, brass knuckles, nunchakus, etc.) does. Under our substantial effects doctrine, even though Congress cannot single out gun possession, it can prohibit weapon possession generally. But one *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce. Under our jurisprudence, if Congress passed an omnibus "substantially affects interstate commerce" statute, purporting to regulate every aspect of human existence, the Act apparently would be constitutional.

Even though particular sections may govern only trivial activities, the statute in the aggregate regulates matters that substantially affect commerce.

## V

This extended discussion of the original understanding and our first century and a half of case law does not necessarily require a wholesale abandonment of our more recent opinions.[8] It simply reveals that our substantial effects test is far removed from both the Constitution and from our early case law and that the Court's opinion should not be viewed as "radical" or another "wrong turn" that must be corrected in the future.[9] The analysis also suggests that we ought to temper our Commerce Clause jurisprudence.

---

[8] Although I might be willing to return to the original understanding, I recognize that many believe that it is too late in the day to undertake a fundamental reexamination of the past 60 years. Consideration of *stare decisis* and reliance interests may convince us that we cannot wipe the slate clean.

[9] Nor can the majority's opinion fairly be compared to *Lochner* v. *New York*, 198 U. S. 45 (1905). See *post*, at 604–609 (SOUTER, J., dissenting). Unlike *Lochner* and our more recent "substantive due process" cases, today's decision enforces only the Constitution and not "judicial policy judgments." See *post*, at 607. Notwithstanding JUSTICE SOUTER's discussion, "'commercial' character" is not only a natural but an inevitable "ground of *Commerce* Clause distinction." See *post*, at 608 (emphasis added). Our invalidation of the Gun-Free School Zones Act therefore falls comfortably within our proper role in reviewing federal legislation to determine if it exceeds congressional authority as defined by the Constitution itself. As John Marshall put it: "If [Congress] were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard . . . . They would declare it void." 3 Debates 553 (before the Virginia ratifying convention); see also The Federalist No. 44, at 305 (J. Madison) (asserting that if Congress exercises powers "not warranted by [the Constitution's] true meaning" the judiciary will defend the Constitution); *id.*, No. 78, at 526 (A. Hamilton) (asserting that the "courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments"). Where, as here, there is a case or controversy, there can be no "misstep," *post*, at 614, in enforcing the Constitution.

Unless the dissenting Justices are willing to repudiate our long-held understanding of the limited nature of federal power, I would think that they, too, must be willing to reconsider the substantial effects test in a future case. If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be "defined" as being "'commensurate with the national needs'" or self-consciously intended to let the Federal Government "'defend itself against economic forces that Congress decrees inimical or destructive of the national economy.'" See *post*, at 625 (BREYER, J., dissenting) (quoting *North American Co.* v. *SEC*, 327 U. S., at 705). Such a formulation of federal power is no test at all: It is a blank check.

At an appropriate juncture, I think we must modify our Commerce Clause jurisprudence. Today, it is easy enough to say that the Clause certainly does not empower Congress to ban gun possession within 1,000 feet of a school.

JUSTICE STEVENS, dissenting.

The welfare of our future "Commerce with foreign Nations, and among the several States," U. S. Const., Art. I, § 8, cl. 3, is vitally dependent on the character of the education of our children. I therefore agree entirely with JUSTICE BREYER's explanation of why Congress has ample power to prohibit the possession of firearms in or near schools—just as it may protect the school environment from harms posed by controlled substances such as asbestos or alcohol. I also agree with JUSTICE SOUTER's exposition of the radical character of the Court's holding and its kinship with the discredited, pre-Depression version of substantive due process. Cf. *Dolan* v. *City of Tigard*, 512 U. S. 374, 405–411 (1994) (STEVENS, J., dissenting). I believe, however, that the Court's extraordinary decision merits this additional comment.

Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the con-

sequence, either directly or indirectly, of commercial activity. In my judgment, Congress' power to regulate commerce in firearms includes the power to prohibit possession of guns at any location because of their potentially harmful use; it necessarily follows that Congress may also prohibit their possession in particular markets. The market for the possession of handguns by school-age children is, distressingly, substantial.* Whether or not the national interest in eliminating that market would have justified federal legislation in 1789, it surely does today.

JUSTICE SOUTER, dissenting.

In reviewing congressional legislation under the Commerce Clause, we defer to what is often a merely implicit congressional judgment that its regulation addresses a subject substantially affecting interstate commerce "if there is any rational basis for such a finding." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981); *Preseault* v. *ICC*, 494 U. S. 1, 17 (1990); see *Maryland* v. *Wirtz*, 392 U. S. 183, 190 (1968), quoting *Katzenbach* v. *McClung*, 379 U. S. 294, 303–304 (1964). If that congressional determination is within the realm of reason, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.'" *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 276, quoting *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 262 (1964); see also *Preseault* v. *ICC, supra,* at 17.[1]

---

*Indeed, there is evidence that firearm manufacturers—aided by a federal grant—are specifically targeting schoolchildren as consumers by distributing, at schools, hunting-related videos styled "educational materials for grades four through 12," Herbert, Reading, Writing, Reloading, N. Y. Times, Dec. 14, 1994, p. A23, col. 1.

[1] In this case, no question has been raised about means and ends; the only issue is about the effect of school zone guns on commerce.

The practice of deferring to rationally based legislative judgments "is a paradigm of judicial restraint." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 314 (1993). In judicial review under the Commerce Clause, it reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes from Congress's political accountability in dealing with matters open to a wide range of possible choices. See *id.*, at 313–316; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276; *United States* v. *Carolene Products Co.*, 304 U. S. 144, 147, 151–154 (1938); cf. *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 488 (1955).

It was not ever thus, however, as even a brief overview of Commerce Clause history during the past century reminds us. The modern respect for the competence and primacy of Congress in matters affecting commerce developed only after one of this Court's most chastening experiences, when it perforce repudiated an earlier and untenably expansive conception of judicial review in derogation of congressional commerce power. A look at history's sequence will serve to show how today's decision tugs the Court off course, leading it to suggest opportunities for further developments that would be at odds with the rule of restraint to which the Court still wisely states adherence.

I

Notwithstanding the Court's recognition of a broad commerce power in *Gibbons* v. *Ogden*, 9 Wheat. 1, 196–197 (1824) (Marshall, C. J.), Congress saw few occasions to exercise that power prior to Reconstruction, see generally 2 C. Warren, The Supreme Court in United States History 729–739 (rev. ed. 1935), and it was really the passage of the Interstate Commerce Act of 1887 that opened a new age of congressional reliance on the Commerce Clause for authority to exercise general police powers at the national level, see *id.*, at

729–730. Although the Court upheld a fair amount of the ensuing legislation as being within the commerce power, see, *e. g., Stafford* v. *Wallace,* 258 U. S. 495 (1922) (upholding an Act regulating trade practices in the meat packing industry); *Shreveport Rate Cases,* 234 U. S. 342 (1914) (upholding Interstate Commerce Commission order to equalize interstate and intrastate rail rates); see generally Warren, *supra,* at 729–739, the period from the turn of the century to 1937 is better noted for a series of cases applying highly formalistic notions of "commerce" to invalidate federal social and economic legislation, see, *e. g., Carter* v. *Carter Coal Co.,* 298 U. S. 238, 303–304 (1936) (striking Act prohibiting unfair labor practices in coal industry as regulation of "mining" and "production," not "commerce"); *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 545–548 (1935) (striking congressional regulation of activities affecting interstate commerce only "indirectly"); *Hammer* v. *Dagenhart,* 247 U. S. 251 (1918) (striking Act prohibiting shipment in interstate commerce of goods manufactured at factories using child labor because the Act regulated "manufacturing," not "commerce"); *Adair* v. *United States,* 208 U. S. 161 (1908) (striking protection of labor union membership as outside "commerce").

These restrictive views of commerce subject to congressional power complemented the Court's activism in limiting the enforceable scope of state economic regulation. It is most familiar history that during this same period the Court routinely invalidated state social and economic legislation under an expansive conception of Fourteenth Amendment substantive due process. See, *e. g., Louis K. Liggett Co.* v. *Baldridge,* 278 U. S. 105 (1928) (striking state law requiring pharmacy owners to be licensed as pharmacists); *Coppage* v. *Kansas,* 236 U. S. 1 (1915) (striking state law prohibiting employers from requiring their employees to agree not to join labor organizations); *Lochner* v. *New York,* 198 U. S. 45 (1905) (striking state law establishing maximum working hours for bakers). See generally L. Tribe, American Consti-

tutional Law 568–574 (2d ed. 1988). The fulcrums of judicial review in these cases were the notions of liberty and property characteristic of laissez-faire economics, whereas the Commerce Clause cases turned on what was ostensibly a structural limit of federal power, but under each conception of judicial review the Court's character for the first third of the century showed itself in exacting judicial scrutiny of a legislature's choice of economic ends and of the legislative means selected to reach them.

It was not merely coincidental, then, that sea changes in the Court's conceptions of its authority under the Due Process and Commerce Clauses occurred virtually together, in 1937, with *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, and *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1. See Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv. L. Rev. 645, 674–682 (1946). In *West Coast Hotel*, the Court's rejection of a due process challenge to a state law fixing minimum wages for women and children marked the abandonment of its expansive protection of contractual freedom. Two weeks later, *Jones & Laughlin* affirmed congressional commerce power to authorize NLRB injunctions against unfair labor practices. The Court's finding that the regulated activity had a direct enough effect on commerce has since been seen as beginning the abandonment, for practical purposes, of the formalistic distinction between direct and indirect effects.

In the years following these decisions, deference to legislative policy judgments on commercial regulation became the powerful theme under both the Due Process and Commerce Clauses, see *United States* v. *Carolene Products Co.*, 304 U. S., at 147–148, 152; *United States* v. *Darby*, 312 U. S. 100, 119–121 (1941); *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 118–119 (1942), and in due course that deference became articulate in the standard of rationality review. In due process litigation, the Court's statement of a rational

basis test came quickly. See *United States* v. *Carolene Products Co., supra,* at 152; see also *Williamson* v. *Lee Optical Co., supra,* at 489–490. The parallel formulation of the Commerce Clause test came later, only because complete elimination of the direct/indirect effects dichotomy and acceptance of the cumulative effects doctrine, *Wickard* v. *Filburn,* 317 U. S. 111, 125, 127–129 (1942); *United States* v. *Wrightwood Dairy Co., supra,* at 124–126, so far settled the pressing issues of congressional power over commerce as to leave the Court for years without any need to phrase a test explicitly deferring to rational legislative judgments. The moment came, however, with the challenge to congressional Commerce Clause authority to prohibit racial discrimination in places of public accommodation, when the Court simply made explicit what the earlier cases had implied: "where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." *Katzenbach* v. *McClung,* 379 U. S., at 303–304, discussing *United States* v. *Darby, supra;* see *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S., at 258–259. Thus, under commerce, as under due process, adoption of rational basis review expressed the recognition that the Court had no sustainable basis for subjecting economic regulation as such to judicial policy judgments, and for the past half century the Court has no more turned back in the direction of formalistic Commerce Clause review (as in deciding whether regulation of commerce was sufficiently direct) than it has inclined toward reasserting the substantive authority of *Lochner* due process (as in the inflated protection of contractual autonomy). See, *e. g., Maryland* v. *Wirtz,* 392 U. S., at 190, 198; *Perez* v. *United States,* 402 U. S. 146, 151–157 (1971); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S., at 276, 277.

## II

There is today, however, a backward glance at both the old pitfalls, as the Court treats deference under the rationality rule as subject to gradation according to the commercial or noncommercial nature of the immediate subject of the challenged regulation. See *ante,* at 558–561. The distinction between what is patently commercial and what is not looks much like the old distinction between what directly affects commerce and what touches it only indirectly. And the act of calibrating the level of deference by drawing a line between what is patently commercial and what is less purely so will probably resemble the process of deciding how much interference with contractual freedom was fatal. Thus, it seems fair to ask whether the step taken by the Court today does anything but portend a return to the untenable jurisprudence from which the Court extricated itself almost 60 years ago. The answer is not reassuring. To be sure, the occasion for today's decision reflects the century's end, not its beginning. But if it seems anomalous that the Congress of the United States has taken to regulating school yards, the Act in question is still probably no more remarkable than state regulation of bake shops 90 years ago. In any event, there is no reason to hope that the Court's qualification of rational basis review will be any more successful than the efforts at substantive economic review made by our predecessors as the century began. Taking the Court's opinion on its own terms, JUSTICE BREYER has explained both the hopeless porosity of "commercial" character as a ground of Commerce Clause distinction in America's highly connected economy, and the inconsistency of this categorization with our rational basis precedents from the last 50 years.

Further glosses on rationality review, moreover, may be in the offing. Although this case turns on commercial character, the Court gestures toward two other considerations that it might sometime entertain in applying rational basis

scrutiny (apart from a statutory obligation to supply independent proof of a jurisdictional element): does the congressional statute deal with subjects of traditional state regulation, and does the statute contain explicit factual findings supporting the otherwise implicit determination that the regulated activity substantially affects interstate commerce? Once again, any appeal these considerations may have depends on ignoring the painful lesson learned in 1937, for neither of the Court's suggestions would square with rational basis scrutiny.

## A

The Court observes that the Gun-Free School Zones Act operates in two areas traditionally subject to legislation by the States, education and enforcement of criminal law. The suggestion is either that a connection between commerce and these subjects is remote, or that the commerce power is simply weaker when it touches subjects on which the States have historically been the primary legislators. Neither suggestion is tenable. As for remoteness, it may or may not be wise for the National Government to deal with education, but JUSTICE BREYER has surely demonstrated that the commercial prospects of an illiterate State or Nation are not rosy, and no argument should be needed to show that hijacking interstate shipments of cigarettes can affect commerce substantially, even though the States have traditionally prosecuted robbery. And as for the notion that the commerce power diminishes the closer it gets to customary state concerns, that idea has been flatly rejected, and not long ago. The commerce power, we have often observed, is plenary. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 276; *United States* v. *Darby,* 312 U. S., at 114; see *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 549–550 (1985); *Gibbons* v. *Ogden,* 9 Wheat., at 196–197. Justice Harlan put it this way in speaking for the Court in *Maryland* v. *Wirtz:*

"There is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other. . . . [I]t is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests . . . . As long ago as [1925], the Court put to rest the contention that state concerns might constitutionally 'outweigh' the importance of an otherwise valid federal statute regulating commerce." 392 U. S., at 195–196 (citations and internal quotation marks omitted).

See also *United States* v. *Darby, supra,* at 114; *Gregory* v. *Ashcroft,* 501 U. S. 452, 460 (1991); *United States* v. *Carolene Products Co.,* 304 U. S., at 147.

Nor is there any contrary authority in the reasoning of our cases imposing clear statement rules in some instances of legislation that would significantly alter the state-national balance. In the absence of a clear statement of congressional design, for example, we have refused to interpret ambiguous federal statutes to limit fundamental state legislative prerogatives, *Gregory* v. *Ashcroft, supra,* at 460–464, our understanding being that such prerogatives, through which "a State defines itself as a sovereign," are "powers with which Congress does not readily interfere," 501 U. S., at 460, 461. Likewise, when faced with two plausible interpretations of a federal criminal statute, we generally will take the alternative that does not force us to impute an intention to Congress to use its full commerce power to regulate conduct traditionally and ably regulated by the States. See *United States* v. *Enmons,* 410 U. S. 396, 411–412 (1973); *United States* v. *Bass,* 404 U. S. 336, 349–350 (1971); *Rewis* v. *United States,* 401 U. S. 808, 812 (1971).

These clear statement rules, however, are merely rules of statutory interpretation, to be relied upon only when the

terms of a statute allow, *United States* v. *Culbert*, 435 U. S. 371, 379–380 (1978); see *Gregory* v. *Ashcroft, supra,* at 470; *United States* v. *Bass, supra,* at 346–347, and in cases implicating Congress's historical reluctance to trench on state legislative prerogatives or to enter into spheres already occupied by the States, *Gregory* v. *Ashcroft, supra,* at 461; *United States* v. *Bass, supra,* at 349; see *Rewis* v. *United States, supra,* at 811–812. They are rules for determining intent when legislation leaves intent subject to question. But our hesitance to presume that Congress has acted to alter the state-federal status quo (when presented with a plausible alternative) has no relevance whatever to the enquiry whether it has the commerce power to do so or to the standard of judicial review when Congress has definitely meant to exercise that power. Indeed, to allow our hesitance to affect the standard of review would inevitably degenerate into the sort of substantive policy review that the Court found indefensible 60 years ago. The Court does not assert (and could not plausibly maintain) that the commerce power is wholly devoid of congressional authority to speak on any subject of traditional state concern; but if congressional action is not forbidden absolutely when it touches such a subject, it will stand or fall depending on the Court's view of the strength of the legislation's commercial justification. And here once again history raises its objections that the Court's previous essays in overriding congressional policy choices under the Commerce Clause were ultimately seen to suffer two fatal weaknesses: when dealing with Acts of Congress (as distinct from state legislation subject to review under the theory of dormant commerce power) nothing in the Clause compelled the judicial activism, and nothing about the judiciary as an institution made it a superior source of policy on the subject Congress dealt with. There is no reason to expect the lesson would be different another time.

## B

There remain questions about legislative findings. The Court of Appeals expressed the view, 2 F. 3d 1342, 1363–1368 (CA5 1993), that the result in this case might well have been different if Congress had made explicit findings that guns in schools have a substantial effect on interstate commerce, and the Court today does not repudiate that position, see *ante*, at 562–563. Might a court aided by such findings have subjected this legislation to less exacting scrutiny (or, put another way, should a court have deferred to such findings if Congress had made them)?[2] The answer to either question must be no, although as a general matter findings are important and to be hoped for in the difficult cases.

It is only natural to look for help with a hard job, and reviewing a claim that Congress has exceeded the commerce power is much harder in some cases than in others. A challenge to congressional regulation of interstate garbage hauling would be easy to resolve; review of congressional regulation of gun possession in school yards is more difficult, both because the link to interstate commerce is less obvious and because of our initial ignorance of the relevant facts. In a

---

[2] Unlike the Court, (perhaps), I would see no reason not to consider Congress's findings, insofar as they might be helpful in reviewing the challenge to this statute, even though adopted in later legislation. See the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103–322, § 320904, 108 Stat. 2125 ("[T]he occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country; . . . this decline . . . has an adverse impact on interstate commerce and the foreign commerce of the United States; . . . Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection"). The findings, however, go no further than expressing what is obviously implicit in the substantive legislation, at such a conclusory level of generality as to add virtually nothing to the record. The Solicitor General certainly exercised sound judgment in placing no significant reliance on these particular afterthoughts. Tr. of Oral Arg. 24–25.

case comparable to this one, we may have to dig hard to make a responsible judgment about what Congress could reasonably find, because the case may be close, and because judges tend not to be familiar with the facts that may or may not make it close. But while the ease of review may vary from case to case, it does not follow that the standard of review should vary, much less that explicit findings of fact would even directly address the standard.

The question for the courts, as all agree, is not whether as a predicate to legislation Congress in fact found that a particular activity substantially affects interstate commerce. The legislation implies such a finding, and there is no reason to entertain claims that Congress acted ultra vires intentionally. Nor is the question whether Congress was correct in so finding. The only question is whether the legislative judgment is within the realm of reason. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S., at 276–277; *Katzenbach* v. *McClung*, 379 U. S., at 303–304; *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 391–392 (1935) (Hughes, C. J., dissenting); cf. *FCC* v. *Beach Communications, Inc.*, 508 U. S., at 315 (in the equal protection context, "those attacking the rationality of the legislative classification have the burden to negate every conceivable basis which might support it[;] . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature") (citations and internal quotation marks omitted); *Ferguson* v. *Skrupa*, 372 U. S. 726, 731–733 (1963); *Williamson* v. *Lee Optical Co.*, 348 U. S., at 487. Congressional findings do not, however, directly address the question of reasonableness; they tell us what Congress actually has found, not what it could rationally find. If, indeed, the Court were to make the existence of explicit congressional findings dispositive in some close or difficult cases something other than rationality review would be afoot. The resulting congressional obligation to justify its policy choices on the merits would imply

either a judicial authority to review the justification (and, hence, the wisdom) of those choices, or authority to require Congress to act with some high degree of deliberateness, of which express findings would be evidence. But review for congressional wisdom would just be the old judicial pretension discredited and abandoned in 1937, and review for deliberateness would be as patently unconstitutional as an Act of Congress mandating long opinions from this Court. Such a legislative process requirement would function merely as an excuse for covert review of the merits of legislation under standards never expressed and more or less arbitrarily applied. Under such a regime, in any case, the rationality standard of review would be a thing of the past.

On the other hand, to say that courts applying the rationality standard may not defer to findings is not, of course, to say that findings are pointless. They may, in fact, have great value in telling courts what to look for, in establishing at least one frame of reference for review, and in citing to factual authority. The research underlying JUSTICE BREYER'S dissent was necessarily a major undertaking; help is welcome, and it not incidentally shrinks the risk that judicial research will miss material scattered across the public domain or buried under pounds of legislative record. Congressional findings on a more particular plane than this record illustrates would accordingly have earned judicial thanks. But thanks do not carry the day as long as rational possibility is the touchstone, and I would not allow for the possibility, as the Court's opinion may, *ante*, at 563, that the addition of congressional findings could in principle have affected the fate of the statute here.

### III

Because JUSTICE BREYER's opinion demonstrates beyond any doubt that the Act in question passes the rationality review that the Court continues to espouse, today's decision may be seen as only a misstep, its reasoning and its sugges-

tions not quite in gear with the prevailing standard, but hardly an epochal case. I would not argue otherwise, but I would raise a caveat. Not every epochal case has come in epochal trappings. *Jones & Laughlin* did not reject the direct-indirect standard in so many words; it just said the relation of the regulated subject matter to commerce was direct enough. 301 U. S., at 41–43. But we know what happened.

I respectfully dissent.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The issue in this case is whether the Commerce Clause authorizes Congress to enact a statute that makes it a crime to possess a gun in, or near, a school. 18 U. S. C. § 922(q)(1)(A) (1988 ed., Supp. V). In my view, the statute falls well within the scope of the commerce power as this Court has understood that power over the last half century.

## I

In reaching this conclusion, I apply three basic principles of Commerce Clause interpretation. First, the power to "regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3, encompasses the power to regulate local activities insofar as they significantly affect interstate commerce. See, *e. g., Gibbons* v. *Ogden*, 9 Wheat. 1, 194–195 (1824) (Marshall, C. J.); *Wickard* v. *Filburn*, 317 U. S. 111, 125 (1942). As the majority points out, *ante*, at 559, the Court, in describing how much of an effect the Clause requires, sometimes has used the word "substantial" and sometimes has not. Compare, *e. g., Wickard, supra*, at 125 ("substantial economic effect"), with *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981) ("affects interstate commerce"); see also *Maryland* v. *Wirtz*, 392 U. S. 183, 196, n. 27 (1968) (cumulative effect must not be "trivial"); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37 (1937)

(speaking of "close and substantial *relation*" between activity and commerce, not of "substantial effect") (emphasis added); *Gibbons, supra,* at 194 (words of Commerce Clause do not "comprehend . . . commerce, which is completely internal . . . and which does not . . . affect other States"). And, as the majority also recognizes in quoting Justice Cardozo, the question of degree (how *much* effect) requires an estimate of the "size" of the effect that no verbal formulation can capture with precision. See *ante,* at 567. I use the word "significant" because the word "substantial" implies a somewhat narrower power than recent precedent suggests. See, *e. g., Perez* v. *United States,* 402 U. S. 146, 154 (1971); *Daniel* v. *Paul,* 395 U. S. 298, 308 (1969). But to speak of "substantial effect" rather than "significant effect" would make no difference in this case.

Second, in determining whether a local activity will likely have a significant effect upon interstate commerce, a court must consider, not the effect of an individual act (a single instance of gun possession), but rather the cumulative effect of all similar instances (*i. e.,* the effect of all guns possessed in or near schools). See, *e. g., Wickard, supra,* at 127–128. As this Court put the matter almost 50 years ago:

> "[I]t is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that requires preventative regulation." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 236 (1948) (citations omitted).

Third, the Constitution requires us to judge the connection between a regulated activity and interstate commerce, not directly, but at one remove. Courts must give Congress a degree of leeway in determining the existence of a significant factual connection between the regulated activity and interstate commerce—both because the Constitution delegates the commerce power directly to Congress and because the

determination requires an empirical judgment of a kind that a legislature is more likely than a court to make with accuracy. The traditional words "rational basis" capture this leeway. See *Hodel, supra,* at 276–277. Thus, the specific question before us, as the Court recognizes, is not whether the "regulated activity sufficiently affected interstate commerce," but, rather, whether Congress could have had "*a rational basis*" for so concluding. *Ante,* at 557 (emphasis added).

I recognize that we must judge this matter independently. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel, supra,* at 311 (REHNQUIST, J., concurring in judgment). And, I also recognize that Congress did not write specific "interstate commerce" findings into the law under which Lopez was convicted. Nonetheless, as I have already noted, the matter that we review independently (*i. e.,* whether there is a "rational basis") already has considerable leeway built into it. And, the absence of findings, at most, deprives a statute of the benefit of some *extra* leeway. This extra deference, in principle, might change the result in a close case, though, in practice, it has not made a critical legal difference. See, *e. g., Katzenbach* v. *McClung,* 379 U. S. 294, 299 (1964) (noting that "no formal findings were made, which of course are not necessary"); *Perez, supra,* at 156–157; cf. *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 666 (1994) (opinion of KENNEDY, J.) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review"); *Fullilove* v. *Klutznick,* 448 U. S. 448, 503 (1980) (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate . . ."). It would seem particularly unfortunate to make the validity of

the statute at hand turn on the presence or absence of findings. Because Congress did make findings (though not until after Lopez was prosecuted), doing so would appear to elevate form over substance. See Pub. L. 103–322, §§ 320904 (2)(F), (G), 108 Stat. 2125, 18 U. S. C. §§ 922(q)(1)(F), (G).

In addition, despite the Court of Appeals' suggestion to the contrary, see 2 F. 3d 1342, 1365 (CA5 1993), there is no special need here for a clear indication of Congress' rationale. The statute does not interfere with the exercise of state or local authority. Cf., e. g., Dellmuth v. Muth, 491 U. S. 223, 227–228 (1989) (requiring clear statement for abrogation of Eleventh Amendment immunity). Moreover, any clear statement rule would apply only to determine Congress' intended result, not to clarify the source of its authority or measure the level of consideration that went into its decision, and here there is no doubt as to which activities Congress intended to regulate. See ibid.; id., at 233 (SCALIA, J., concurring) (to subject States to suits for money damages, Congress need only make that intent clear, and need not refer explicitly to the Eleventh Amendment); EEOC v. Wyoming, 460 U. S. 226, 243, n. 18 (1983) (Congress need not recite the constitutional provision that authorizes its action).

## II

Applying these principles to the case at hand, we must ask whether Congress could have had a *rational basis* for finding a significant (or substantial) connection between gun-related school violence and interstate commerce. Or, to put the question in the language of the *explicit* finding that Congress made when it amended this law in 1994: Could Congress rationally have found that "violent crime in school zones," through its effect on the "quality of education," significantly (or substantially) affects "interstate" or "foreign commerce"? 18 U. S. C. §§ 922(q)(1)(F), (G). As long as one views the commerce connection, not as a "technical legal conception," but as "a practical one," *Swift & Co.* v. *United States*, 196

U. S. 375, 398 (1905) (Holmes, J.), the answer to this question must be yes. Numerous reports and studies—generated both inside and outside government—make clear that Congress could reasonably have found the empirical connection that its law, implicitly or explicitly, asserts. (See Appendix, *infra*, at 631, for a sample of the documentation, as well as for complete citations to the sources referenced below.)

For one thing, reports, hearings, and other readily available literature make clear that the problem of guns in and around schools is widespread and extremely serious. These materials report, for example, that four percent of American high school students (and six percent of inner-city high school students) carry a gun to school at least occasionally, Centers for Disease Control 2342; Sheley, McGee, & Wright 679; that 12 percent of urban high school students have had guns fired at them, *ibid.*; that 20 percent of those students have been threatened with guns, *ibid.*; and that, in any 6-month period, several hundred thousand schoolchildren are victims of violent crimes in or near their schools, U. S. Dept. of Justice 1 (1989); House Select Committee Hearing 15 (1989). And, they report that this widespread violence in schools throughout the Nation significantly interferes with the quality of education in those schools. See, *e. g.*, House Judiciary Committee Hearing 44 (1990) (linking school violence to dropout rate); U. S. Dept. of Health 118–119 (1978) (school-violence victims suffer academically); compare U. S. Dept. of Justice 1 (1991) (gun violence worst in inner-city schools), with National Center 47 (dropout rates highest in inner cities). Based on reports such as these, Congress obviously could have thought that guns and learning are mutually exclusive. Senate Labor and Human Resources Committee Hearing 39 (1993); U. S. Dept. of Health 118, 123–124 (1978). Congress could therefore have found a substantial educational problem—teachers unable to teach, students unable to learn—and concluded that guns near schools contribute substantially to the size and scope of that problem.

Having found that guns in schools significantly undermine the quality of education in our Nation's classrooms, Congress could also have found, given the effect of education upon interstate and foreign commerce, that gun-related violence in and around schools is a commercial, as well as a human, problem. Education, although far more than a matter of economics, has long been inextricably intertwined with the Nation's economy. When this Nation began, most workers received their education in the workplace, typically (like Benjamin Franklin) as apprentices. See generally Seybolt; Rorabaugh; U. S. Dept. of Labor (1950). As late as the 1920's, many workers still received general education directly from their employers—from large corporations, such as General Electric, Ford, and Goodyear, which created schools within their firms to help both the worker and the firm. See Bolino 15–25. (Throughout most of the 19th century fewer than one percent of all Americans received secondary education through attending a high school. See *id.*, at 11.) As public school enrollment grew in the early 20th century, see Becker 218 (1993), the need for industry to teach basic educational skills diminished. But, the direct economic link between basic education and industrial productivity remained. Scholars estimate that nearly a quarter of America's economic growth in the early years of this century is traceable directly to increased schooling, see Denison 243; that investment in "human capital" (through spending on education) exceeded investment in "physical capital" by a ratio of almost two to one, see Schultz 26 (1961); and that the economic returns to this investment in education exceeded the returns to conventional capital investment, see, *e. g.*, Davis & Morrall 48–49.

In recent years the link between secondary education and business has strengthened, becoming both more direct and more important. Scholars on the subject report that technological changes and innovations in management techniques have altered the nature of the workplace so that more jobs now demand greater educational skills. See, *e. g.*, MIT 32

(only about one-third of handtool company's 1,000 workers were qualified to work with a new process that requires high-school-level reading and mathematical skills); Cyert & Mowery 68 (gap between wages of high school dropouts and better trained workers increasing); U. S. Dept. of Labor 41 (1981) (job openings for dropouts declining over time). There is evidence that "service, manufacturing or construction jobs are being displaced by technology that requires a better-educated worker or, more likely, are being exported overseas," Gordon, Ponticell, & Morgan 26; that "workers with truly few skills by the year 2000 will find that only one job out of ten will remain," *ibid.;* and that

> "[o]ver the long haul the best way to encourage the growth of high-wage jobs is to upgrade the skills of the work force. . . . [B]etter-trained workers become more productive workers, enabling a company to become more competitive and expand." Henkoff 60.

Increasing global competition also has made primary and secondary education economically more important. The portion of the American economy attributable to international trade nearly tripled between 1950 and 1980, and more than 70 percent of American-made goods now compete with imports. Marshall 205; Marshall & Tucker 33. Yet, lagging worker productivity has contributed to negative trade balances and to real hourly compensation that has fallen below wages in 10 other industrialized nations. See National Center 57; Handbook of Labor Statistics 561, 576 (1989); Neef & Kask 28, 31. At least some significant part of this serious productivity problem is attributable to students who emerge from classrooms without the reading or mathematical skills necessary to compete with their European or Asian counterparts, see, *e. g.,* MIT 28, and, presumably, to high school dropout rates of 20 to 25 percent (up to 50 percent in inner cities), see, *e. g.,* National Center 47; Chubb & Hanushek 215. Indeed, Congress has said, when writing other statutes, that

"functionally or technologically illiterate" Americans in the work force "erod[e]" our economic "standing in the international marketplace," Pub. L. 100–418, § 6002(a)(3), 102 Stat. 1469, and that "[o]ur Nation is . . . paying the price of scientific and technological illiteracy, with our productivity declining, our industrial base ailing, and our global competitiveness dwindling," H. R. Rep. No. 98–6, pt. 1, p. 19 (1983).

Finally, there is evidence that, today more than ever, many firms base their location decisions upon the presence, or absence, of a work force with a basic education. See MacCormack, Newman, & Rosenfield 73; Coffee 296. Scholars on the subject report, for example, that today, "[h]igh speed communication and transportation make it possible to produce most products and services anywhere in the world," National Center 38; that "[m]odern machinery and production methods can therefore be combined with low wage workers to drive costs down," *ibid.;* that managers can perform " 'back office functions anywhere in the world now,' " and say that if they " 'can't get enough skilled workers here' " they will " 'move the skilled jobs out of the country,' " *id.,* at 41; with the consequence that "rich countries need better education and retraining, to reduce the supply of unskilled workers and to equip them with the skills they require for tomorrow's jobs," Survey of Global Economy 37. In light of this increased importance of education to individual firms, it is no surprise that half of the Nation's manufacturers have become involved with setting standards and shaping curricula for local schools, Maturi 65–68, that 88 percent think this kind of involvement is important, *id.,* at 68, that more than 20 States have recently passed educational reforms to attract new business, Overman 61–62, and that business magazines have begun to rank cities according to the quality of their schools, see Boyle 24.

The economic links I have just sketched seem fairly obvious. Why then is it not equally obvious, in light of those links, that a widespread, serious, and substantial physical

threat to teaching and learning *also* substantially threatens the commerce to which that teaching and learning is inextricably tied? That is to say, guns in the hands of six percent of inner-city high school students and gun-related violence throughout a city's schools must threaten the trade and commerce that those schools support. The only question, then, is whether the latter threat is (to use the majority's terminology) "substantial." The evidence of (1) the *extent* of the gun-related violence problem, see *supra,* at 619, (2) the *extent* of the resulting negative effect on classroom learning, see *ibid.,* and (3) the *extent* of the consequent negative commercial effects, see *supra,* at 620–622, when taken together, indicate a threat to trade and commerce that is "substantial." At the very least, Congress could rationally have concluded that the links are "substantial."

Specifically, Congress could have found that gun-related violence near the classroom poses a serious economic threat (1) to consequently inadequately educated workers who must endure low paying jobs, see, *e. g.,* National Center 29, and (2) to communities and businesses that might (in today's "information society") otherwise gain, from a well-educated work force, an important commercial advantage, see, *e. g.,* Becker 10 (1992), of a kind that location near a railhead or harbor provided in the past. Congress might also have found these threats to be no different in kind from other threats that this Court has found within the commerce power, such as the threat that loan sharking poses to the "funds" of "numerous localities," *Perez* v. *United States,* 402 U. S., at 157, and that unfair labor practices pose to instrumentalities of commerce, see *Consolidated Edison Co.* v. *NLRB,* 305 U. S. 197, 221–222 (1938). As I have pointed out, *supra,* at 618, Congress has written that "the occurrence of violent crime in school zones" has brought about a "decline in the quality of education" that "has an adverse impact on interstate commerce and the foreign commerce of the United States." 18 U. S. C. §§ 922(q)(1)(F), (G). The violence-related facts, the educa-

tional facts, and the economic facts, taken together, make this conclusion rational. And, because under our case law, see *supra*, at 615–617; *infra*, at 627–628, the sufficiency of the constitutionally necessary Commerce Clause link between a crime of violence and interstate commerce turns simply upon size or degree, those same facts make the statute constitutional.

To hold this statute constitutional is not to "obliterate" the "distinction between what is national and what is local," *ante*, at 567 (citation omitted; internal quotation marks omitted); nor is it to hold that the Commerce Clause permits the Federal Government to "regulate any activity that it found was related to the economic productivity of individual citizens," to regulate "marriage, divorce, and child custody," or to regulate any and all aspects of education. *Ante*, at 564. First, this statute is aimed at curbing a particularly acute threat to the educational process—the possession (and use) of life-threatening firearms in, or near, the classroom. The empirical evidence that I have discussed above unmistakably documents the special way in which guns and education are incompatible. See *supra*, at 619. This Court has previously recognized the singularly disruptive potential on interstate commerce that acts of violence may have. See *Perez, supra*, at 156–157. Second, the immediacy of the connection between education and the national economic well-being is documented by scholars and accepted by society at large in a way and to a degree that may not hold true for other social institutions. It must surely be the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce.

In sum, a holding that the particular statute before us falls within the commerce power would not expand the scope of that Clause. Rather, it simply would apply pre-existing law to changing economic circumstances. See *Heart of Atlanta*

*Motel, Inc.* v. *United States*, 379 U. S. 241, 251 (1964). It would recognize that, in today's economic world, gun-related violence near the classroom makes a significant difference to our economic, as well as our social, well-being. In accordance with well-accepted precedent, such a holding would permit Congress "to act in terms of economic . . . realities," would interpret the commerce power as "an affirmative power commensurate with the national needs," and would acknowledge that the "commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy." *North American Co.* v. *SEC*, 327 U. S. 686, 705 (1946) (citing *Swift & Co.* v. *United States*, 196 U. S., at 398 (Holmes, J.)).

## III

The majority's holding—that § 922 falls outside the scope of the Commerce Clause—creates three serious legal problems. First, the majority's holding runs contrary to modern Supreme Court cases that have upheld congressional actions despite connections to interstate or foreign commerce that are less significant than the effect of school violence. In *Perez* v. *United States, supra,* the Court held that the Commerce Clause authorized a federal statute that makes it a crime to engage in loan sharking ("[e]xtortionate credit transactions") at a local level. The Court said that Congress may judge that such transactions, "though purely *intra*state, . . . affect *inter*state commerce." 402 U. S., at 154 (emphasis added). Presumably, Congress reasoned that threatening or using force, say with a gun on a street corner, to collect a debt occurs sufficiently often so that the activity (by helping organized crime) affects commerce among the States. But, why then cannot Congress also reason that the threat or use of force—the frequent consequence of possessing a gun—in or near a school occurs sufficiently often so that such activity (by inhibiting basic education) affects

commerce among the States? The negative impact upon the national economy of an inability to teach basic skills seems no smaller (nor less significant) than that of organized crime.

In *Katzenbach* v. *McClung*, 379 U. S. 294 (1964), this Court upheld, as within the commerce power, a statute prohibiting racial discrimination at local restaurants, in part because that discrimination discouraged travel by African Americans and in part because that discrimination affected purchases of food and restaurant supplies from other States. See *id.*, at 300; *Heart of Atlanta Motel, supra,* at 274 (Black, J., concurring in *McClung* and in *Heart of Atlanta*). In *Daniel* v. *Paul,* 395 U. S. 298 (1969), this Court found an effect on commerce caused by an amusement park located several miles down a country road in the middle of Alabama—because some customers (the Court assumed), some food, 15 paddleboats, and a juke box had come from out of state. See *id.*, at 304–305, 308. In both of these cases, the Court understood that the specific instance of discrimination (at a local place of accommodation) was part of a general practice that, considered as a whole, caused not only the most serious human and social harm, but had nationally significant economic dimensions as well. See *McClung, supra,* at 301; *Daniel, supra,* at 307, n. 10. It is difficult to distinguish the case before us, for the same critical elements are present. Businesses are less likely to locate in communities where violence plagues the classroom. Families will hesitate to move to neighborhoods where students carry guns instead of books. (Congress expressly found in 1994 that "parents may decline to send their children to school" in certain areas "due to concern about violent crime and gun violence." 18 U. S. C. § 922(q)(1)(E).) And (to look at the matter in the most narrowly commercial manner), interstate publishers therefore will sell fewer books and other firms will sell fewer school supplies where the threat of violence disrupts learning. Most importantly, like the local racial discrimination at issue in *McClung* and *Daniel,* the local instances here, taken

together and considered as a whole, create a problem that causes serious human and social harm, but also has nationally significant economic dimensions.

In *Wickard* v. *Filburn*, 317 U. S. 111 (1942), this Court sustained the application of the Agricultural Adjustment Act of 1938 to wheat that Filburn grew and consumed on his own local farm because, considered in its totality, (1) homegrown wheat may be "induced by rising prices" to "flow into the market and check price increases," and (2) even if it never actually enters the market, homegrown wheat nonetheless "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market" and, in that sense, "competes with wheat in commerce." *Id.*, at 128. To find both of these effects on commerce significant in amount, the Court had to give Congress the benefit of the doubt. Why would the Court, to find a significant (or "substantial") effect here, have to give Congress any greater leeway? See also *United States* v. *Women's Sportswear Mfrs. Assn.*, 336 U. S. 460, 464 (1949) ("If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze"); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S., at 236 ("[I]t is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that requires preventive regulation").

The second legal problem the Court creates comes from its apparent belief that it can reconcile its holding with earlier cases by making a critical distinction between "commercial" and noncommercial "transaction[s]." *Ante*, at 561. That is to say, the Court believes the Constitution would distinguish between two local activities, each of which has an identical effect upon interstate commerce, if one, but not the other, is "commercial" in nature. As a general matter, this approach fails to heed this Court's earlier warning not to turn "questions of the power of Congress" upon "formula[s]" that would give

"controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce." *Wickard, supra,* at 120.

See also *United States v. Darby,* 312 U. S. 100, 116–117 (1941) (overturning the Court's distinction between "production" and "commerce" in the child labor case, *Hammer* v. *Dagenhart,* 247 U. S. 251, 271–272 (1918)); *Swift & Co.* v. *United States,* 196 U. S., at 398 (Holmes, J.) ("[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business"). Moreover, the majority's test is not consistent with what the Court saw as the point of the cases that the majority now characterizes. Although the majority today attempts to categorize *Perez, McClung,* and *Wickard* as involving intrastate "economic activity," *ante,* at 559, the Courts that decided each of those cases did *not* focus upon the economic nature of the activity regulated. Rather, they focused upon whether that activity *affected* interstate or foreign commerce. In fact, the *Wickard* Court expressly held that Filburn's consumption of homegrown wheat, *"though it may not be regarded as commerce,"* could nevertheless be regulated—*"whatever its nature"*—so long as "it exerts a substantial economic effect on interstate commerce." *Wickard, supra,* at 125 (emphasis added).

More importantly, if a distinction between commercial and noncommercial activities is to be made, this is not the case in which to make it. The majority clearly cannot intend such a distinction to focus narrowly on an act of gun possession standing by itself, for such a reading could not be reconciled with either the civil rights cases (*McClung* and *Daniel*) or *Perez*—in each of those cases the specific transaction (the race-based exclusion, the use of force) was not itself "commercial." And, if the majority instead means to distinguish generally among broad categories of activities, differentiating what is educational from what is commercial, then, as a

practical matter, the line becomes almost impossible to draw. Schools that teach reading, writing, mathematics, and related basic skills serve *both* social and commercial purposes, and one cannot easily separate the one from the other. American industry itself has been, and is again, involved in teaching. See *supra*, at 620, 622. When, and to what extent, does its involvement make education commercial? Does the number of vocational classes that train students directly for jobs make a difference? Does it matter if the school is public or private, nonprofit or profit seeking? Does it matter if a city or State adopts a voucher plan that pays private firms to run a school? Even if one were to ignore these practical questions, why should there be a theoretical distinction between education, when it significantly benefits commerce, and environmental pollution, when it causes economic harm? See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264 (1981).

Regardless, if there is a principled distinction that could work both here and in future cases, Congress (even in the absence of vocational classes, industry involvement, and private management) could rationally conclude that schools fall on the commercial side of the line. In 1990, the year Congress enacted the statute before us, primary and secondary schools spent $230 billion—that is, nearly a quarter of a trillion dollars—which accounts for a significant portion of our $5.5 trillion gross domestic product for that year. See Statistical Abstract 147, 442 (1993). The business of schooling requires expenditure of these funds on student transportation, food and custodial services, books, and teachers' salaries. See U. S. Dept. of Education 4, 7 (1993). These expenditures enable schools to provide a valuable service— namely, to equip students with the skills they need to survive in life and, more specifically, in the workplace. Certainly, Congress has often analyzed school expenditure as if it were a commercial investment, closely analyzing whether schools are efficient, whether they justify the significant resources

they spend, and whether they can be restructured to achieve greater returns. See, *e. g.*, S. Rep. No. 100–222, p. 2 (1987) (federal school assistance is "a prudent investment"); Senate Appropriations Committee Hearing (1994) (private sector management of public schools); cf. Chubb & Moe 185–229 (school choice); Hanushek 85–122 (performance based incentives for educators); Gibbs (decision in Hartford, Conn., to contract out public school system). Why could Congress, for Commerce Clause purposes, not consider schools as roughly analogous to commercial investments from which the Nation derives the benefit of an educated work force?

The third legal problem created by the Court's holding is that it threatens legal uncertainty in an area of law that, until this case, seemed reasonably well settled. Congress has enacted many statutes (more than 100 sections of the United States Code), including criminal statutes (at least 25 sections), that use the words "affecting commerce" to define their scope, see, *e. g.*, 18 U. S. C. § 844(i) (destruction of buildings used in activity affecting interstate commerce), and other statutes that contain no jurisdictional language at all, see, *e. g.*, 18 U. S. C. § 922(*o*)(1) (possession of machineguns). Do these, or similar, statutes regulate noncommercial activities? If so, would that alter the meaning of "affecting commerce" in a jurisdictional element? Cf. *United States* v. *Staszcuk*, 517 F. 2d 53, 57–58 (CA7 1975) (en banc) (Stevens, J.) (evaluation of Congress' intent "requires more than a consideration of the consequences of the particular transaction"). More importantly, in the absence of a jurisdictional element, are the courts nevertheless to take *Wickard*, 317 U. S., at 127–128, (and later similar cases) as inapplicable, and to judge the effect of a single noncommercial activity on interstate commerce without considering similar instances of the forbidden conduct? However these questions are eventually resolved, the legal uncertainty now created will restrict Congress' ability to enact criminal laws aimed at criminal behavior that, considered problem by problem rather

than instance by instance, seriously threatens the economic, as well as social, well-being of Americans.

## IV

In sum, to find this legislation within the scope of the Commerce Clause would permit "Congress . . . to act in terms of economic . . . realities." *North American Co.* v. *SEC*, 327 U. S., at 705 (citing *Swift & Co.* v. *United States*, 196 U. S., at 398 (Holmes, J.)). It would interpret the Clause as this Court has traditionally interpreted it, with the exception of one wrong turn subsequently corrected. See *Gibbons* v. *Ogden*, 9 Wheat., at 195 (holding that the commerce power extends "to all the external concerns of the nation, and to those internal concerns which affect the States generally"); *United States* v. *Darby*, 312 U. S., at 116–117 ("The conclusion is inescapable that *Hammer* v. *Dagenhart* [the child labor case] was a departure from the principles which have prevailed in the interpretation of the Commerce Clause both before and since the decision . . . . It should be and now is overruled"). Upholding this legislation would do no more than simply recognize that Congress had a "rational basis" for finding a significant connection between guns in or near schools and (through their effect on education) the interstate and foreign commerce they threaten. For these reasons, I would reverse the judgment of the Court of Appeals. Respectfully, I dissent.

## APPENDIX TO OPINION OF BREYER, J.

*Congressional Materials*
(in reverse chronological order)

Private Sector Management of Public Schools, Hearing before the Subcommittee on Labor, Health and Human Services, and Education and Related Agencies of the Senate Committee on Appropriations, 103d Cong., 2d Sess. (1994) (Senate Appropriations Committee Hearing (1994)).

Children and Gun Violence, Hearings before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (Senate Judiciary Committee Hearing (1993)).

Keeping Every Child Safe: Curbing the Epidemic of Violence, Joint Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources and the House Select Committee on Children, Youth, and Families, 103d Cong., 1st Sess. (1993).

Recess from Violence: Making our Schools Safe, Hearing before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 103d Cong., 1st Sess. (1993) (Senate Labor and Human Resources Committee Hearing (1993)).

Preparing for the Economy of the 21st Century, Hearings before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 102d Cong., 2d Sess. (1992).

Children Carrying Weapons: Why the Recent Increase, Hearing before the Senate Committee on the Judiciary, 102d Cong., 2d Sess. (1992).

Youth Violence Prevention, Hearing before the Senate Committee on Governmental Affairs, 102d Cong., 2d Sess. (1992).

School Dropout Prevention and Basic Skills Improvement Act of 1990, Pub. L. 101–600, § 2(a)(2), 104 Stat. 3042.

Excellence in Mathematics, Science and Engineering Education Act of 1990, 104 Stat. 2883, 20 U. S. C. § 5301(a)(5) (1988 ed., Supp. V).

Oversight Hearing on Education Reform and American Business and the Implementation of the Hawkins-Stafford Amendments of 1988, Hearing before the Subcommittee on Elementary, Secondary, and Vocational Training of the

House Committee on Education and Labor, 101st Cong., 2d Sess. (1990).

U. S. Power in a Changing World, Report Prepared for the Subcommittee on International Economic Policy and Trade of the House Committee on Foreign Affairs, 101st Cong., 2d Sess., 43–66 (1990).

Gun Free School Zones Act of 1990, Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 101st Cong., 2d Sess. (1990) (House Judiciary Committee Hearing (1990)).

Restoring American Productivity: The Role of Education and Human Resources, Hearing before the Senate Committee on Labor and Human Resources, 101st Cong., 1st Sess. (1989).

Children and Guns, Hearing before the House Select Committee on Children, Youth, and Families, 101st Cong., 1st Sess. (1989) (House Select Committee Hearing (1989)).

Education and Training for a Competitive America Act of 1988, Pub. L. 100–418, Title VI, 102 Stat. 1469.

S. Rep. No. 100–222 (1987).

Education and Training for American Competitiveness, Hearings before the House Committee on Education and Labor, 100th Cong., 1st Sess. (1987).

Competitiveness and the Quality of the American Work Force, Hearings before the Subcommittee on Education and Health of the Joint Economic Committee, 100th Cong., 1st Sess., pts. 1 and 2 (1987).

Oversight Hearing on Illiteracy, Joint Hearing before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor and the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 99th Cong., 2d Sess. (1986).

634

Oversight on Illiteracy in the United States, Hearings before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor, 99th Cong., 2d Sess. (1986).

Crime and Violence in the Schools, Hearing before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 98th Cong., 2d Sess. (1984).

H. R. Rep. No. 98-6, pts. 1 and 2 (1983).

S. Rep. No. 98-151 (1983).

Education for Economic Security Act, Hearings before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 98th Cong., 1st Sess. (1983).

Pub. L. 93-380, § 825, 88 Stat. 602 (1974).

I. Clarke, Art and Industry: Instruction in Drawing Applied to the Industrial and Fine Arts, S. Exec. Doc. No. 209, 46th Cong., 2d Sess., pt. 2 (1891).

*Other Federal Government Materials*
(in reverse chronological order)

U. S. Dept. of Education, Office of Educational Research and Improvement, First Findings: The Educational Quality of the Workforce Employer Survey (Feb. 1995).

Economic Report of the President 108 (Feb. 1994).

U. S. Dept. of Commerce, Statistical Abstract of the United States (1993) (Statistical Abstract (1993)).

U. S. Dept. of Education, Office of Educational Research and Improvement, Public School Education Financing for School Year 1989-90 (June 1993) (U. S. Dept. of Education (1993)).

Economic Report of the President 101 (Feb. 1992).

U. S. Dept. of Labor, Secretary's Commission on Achieving Necessary Skills, Skills and Tasks For Jobs: A SCANS Report for America 2000 (1992).

U. S. Dept. of Labor, Employment and Training Administration, Beyond the School Doors: The Literacy Needs of Job Seekers Served by the U. S. Department of Labor (Sept. 1992).

U. S. Dept. of Justice, Bureau of Justice Statistics, School Crime: A National Crime Victimization Survey Report (Sept. 1991) (U. S. Dept. of Justice (1991)).

U. S. Dept. of Commerce, Bureau of Census, 1990 Census of Population: Education in the United States 474 (Jan. 1994).

U. S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Weapons in Schools, OJJDP Bulletin 1 (Oct. 1989) (U. S. Dept. of Justice (1989)).

U. S. Dept. of Labor, Bureau of Labor Statistics, Handbook of Labor Statistics 281, 561, 576 (Aug. 1989) (Handbook of Labor Statistics (1989)).

Bishop, Incentives for Learning: Why American High School Students Compare So Poorly to their Counterparts Overseas, in 1 U. S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 1 (Sept. 1989).

Rumberger & Levin, Schooling for the Modern Workplace, in 1 U. S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 85 (Sept. 1989).

U. S. Dept. of Education and U. S. Department of Labor, The Bottom Line: Basic Skills in the Workplace 12 (1988).

U. S. Dept. of Labor, Employment and Training Administration, Estimating Educational Attainment of Future Employment Demand for States (Oct. 1981) (U. S. Dept. of Labor (1981)).

U. S. Dept. of Health, Education, and Welfare, National Institute of Education, Violent Schools—Safe Schools: The Safe School Study Report to Congress (1978) (U. S. Dept. of Health (1978)).

U. S. Dept. of Labor, Bureau of Apprenticeship, Apprenticeship Past and Present (1950) (U. S. Dept. of Labor (1950)).

*Other Readily Available Materials*
(in alphabetical order)

Akin & Garfinkel, School Expenditures and the Economic Returns to Schooling, 12 J. Human Resources 462 (1977).

American Council on Education, Business-Higher Education Forum, America's Competitive Challenge: A Report to the President of the United States (Apr. 1983).

Applebome, Employers Wary of School System, N. Y. Times, Feb. 20, 1995, p. A1, col. 1.

Are Real Estate Firms Ready to Ride on the Infobahn?: Information Highway of Technology, 36 National Real Estate Investor, Oct. 1994, p. 6.

Aring, What the 'V' Word is Costing America's Economy: Vocational Education, 74 Phi Delta Kappan 396 (1993).

G. Atkinson, The Economics of Education (1983).

Becker, The Adam Smith Address: Education, Labor Force Quality, and the Economy, Business Economics, Jan. 1992, p. 7 (Becker (1992)).

G. Becker, Human Capital (3d ed. 1993) (Becker (1993)).

I. Berg, Education and Jobs: The Great Training Robbery (1970).

Berryman, The Economy, Literacy Requirements, and At-Risk Adults, in Literacy and the Marketplace: Improving the Literacy of Low-Income Single Mothers 22 (June 1989).

Bishop, Is the Test Score Decline Responsible for the Productivity Growth Decline?, 79 Am. Econ. Rev. 178 (Mar. 1989).

Bishop, High School Performance and Employee Recruitment, 13 J. Labor Research 41 (1992).

Blackburn, What Can Explain the Increase in Earnings Inequality Among Males?, 29 Industrial Relations 441 (1990).

Boissiere, Knight, & Sabot, Earnings, Schooling, Ability and Cognitive Skills, 75 Am. Econ. Rev. 1016 (1985).

A. Bolino, A Century of Human Capital by Education and Training (1989) (Bolino).

Boyle, Expansion Management's Education Quotient, Economic Development Rev., Winter 1992, pp. 23–25 (Boyle).

Brandel, Wake Up Get Smart, New England Business, May 1991, p. 46.

Callahan & Rivara, Urban High School Youth and Handguns: A School-Based Survey, 267 JAMA 3038 (1992).

Card & Krueger, Does School Quality Matter? Returns to Education and the Characteristics of Public Schools in the United States, 100 J. Pol. Econ. 1 (1992).

A. Carnevale, America and the New Economy: How New Competitive Standards are Radically Changing American Workplaces (1991).

A. Carnevale and J. Porro, Quality Education: School Reform for the New American Economy 31–32 (1994).

Center to Prevent Handgun Violence, Caught in the Crossfire: A Report on Gun Violence in our Nation's Schools (Sept. 1990).

Centers For Disease Control, Leads from the Morbidity and Mortality Weekly Report, 266 JAMA 2342 (1991) (Centers for Disease Control).

Chubb & Hanushek, Reforming Educational Reform, in Setting National Priorities 213 (H. Aaron ed. 1990) (Chubb & Hanushek).

J. Chubb & T. Moe, Politics, Markets, and America's Schools (1990) (Chubb & Moe).

Coffee, Survey: Worker Skills, Training More Important in Site Selection, Site Selection, Apr. 1993, p. 296 (Coffee).

E. Cohn, The Economics of Education (rev. ed. 1979).

638

Council on Competitiveness, Competitiveness Index 5 (July 1994).

Council on Competitiveness, Elevating the Skills of the American Workforce (May 1993).

Council on Competitiveness, Governing America: A Competitiveness Policy Agenda for The New Administration 33–39 (1989).

R. Cyert & D. Mowery, Technology and Employment: Innovation and Growth in the U.S. Economy (1987) (Cyert & Mowery).

J. Cynoweth, Enhancing Literacy for Jobs and Productivity: Council of State Policy and Planning Agencies Report (1994).

J. Davis & J. Morrall, Evaluating Educational Investment (1974) (Davis & Morrall).

Denison, Education and Growth, in Economics and Education 237 (D. Rogers & H. Ruchlin eds. 1971) (Denison).

M. Dertouzos, R. Lester, & R. Solow, MIT Commission on Industrial Productivity, Made In America: Regaining the Productive Edge (1989).

A. DeYoung, Economics and American Education: A Historical and Critical Overview of the Impact of Economic Theories on Schooling in the United States (1989).

Downs, America's Educational Failures Will Hurt Real Estate, National Real Estate Investor, Aug. 1988, p. 34.

Doyle, The Role of Private Sector Management in Public Education, 76 Phi Delta Kappan 128 (1994).

Education and Economic Development (C. Anderson & M. Bowman eds. 1965).

Education Commission of the States, Task Force on Education for Economic Growth, Action for Excellence (June 1983).

Educational Testing Service, Developing the Skills and Knowledge of the Workforce (1993).

Finding What Really Works in Education, Chief Executive, May 1994, p. 48.

Ganderton & Griffin, Impact of Child Quality on Earnings: The Productivity-of-Schooling Hypothesis, 11 Contemporary Policy Issues 39 (July 1993).

Garver, "Success Story!": The Evolution of Economic Development in Broward County, Florida, 11 Economic Development Review 85 (Summer 1993).

Gibbs, Schools for Profit, Time, Oct. 17, 1994, p. 48 (Gibbs).

Gintis, Education, Technology, and the Characteristics of Worker Productivity, 61 Am. Econ. Rev. 266 (1971).

Glazer, A Human Capital Policy for the Cities, Public Interest, Summer 1993, p. 27.

Glazer, Violence in Schools: Can Anything be Done to Curb the Growing Violence?, The CQ Researcher, Sept. 11, 1992, pp. 785–808.

E. Gordon, J. Ponticell, & R. Morgan, Closing the Literacy Gap in American Business 23 (1991) (Gordon, Ponticell, & Morgan).

E. Hanushek, Making Schools Work: Improving Performance and Controlling Costs (1994) (Hanushek).

Henkoff, Where Will the Jobs Come From?, Fortune, Oct. 19, 1992, p. 58 (Henkoff).

Herbert, Reading, Writing, Reloading, N. Y. Times, Dec. 14, 1994, p. A23, col. 1.

Industry's New Schoolhouse, N. Y. Times, Jan. 9, 1994, section 4A, p. 22, col. 3, Education Life Supp.

Introducing the EQ (Education Quotient), Expansion Management, Sept./Oct. 1991, pp. 18–24.

Investment in Education: The Equity-Efficiency Quandary (T. Schultz ed. 1972).

Itzkoff, America's Unspoken Economic Dilemma: Falling Intelligence Levels, 18 J. Social, Pol. & Econ. Studies 311 (1993).

Johnson, The Private Sector Should Help U. S. Schools, Financier, Sept. 1991, p. 34.

Johnson & Stafford, Social Returns to Quantity and Quality of Schooling, 8 J. Human Resources 139 (1973).

W. Johnston & A. Packer, Workforce 2000: Work and Workers for the Twenty-first Century (1987).

Jorgenson, The Contribution of Education to U. S. Economic Growth, 1948–73, in Education and Economic Productivity 95 (E. Dean ed. 1984).

Kirkland, Are Service Jobs Good Jobs?, Fortune, June 10, 1985, p. 38.

J. Kozol, Illiterate America 13 (1985).

J. Kozol, Where Stands the Republic? Illiteracy: A Warning and a Challenge to the Nation's Press 9 (1986).

M. Levin & A. Shank, Educational Investment in an Urban Society: Costs, Benefits, and Public Policy (1970).

Link & Ratledge, Social Returns to Quantity and Quality of Education: A Further Statement, 10 J. Human Resources 78 (1975).

Lyne, The Skills Gap: U. S. Work-Force Woes Complicate Business-Location Equation, Site Selection, Aug. 1992, p. 642.

MacCormack, Newman, & Rosenfield, The New Dynamics of Global Manufacturing Site Location, 35 Sloan Management Review, No. 4, p. 69 (1994) (MacCormack, Newman, & Rosenfield).

F. Machlup, Education and Economic Growth (1970).

Markey, The Labor Market Problems of Today's High School Dropouts, Monthly Labor Review, June 1988, p. 36.

Marshall, The Implications of Internationalization for Labor Market Institutions and Industrial Relations Systems, in Rethinking Employment Policy 205 (D. Bawden & F. Skidmore eds. 1989) (Marshall).

R. Marshall & M. Tucker, Thinking for a Living: Work, Skills, and the Future of the American Economy 33 (1992) (Marshall & Tucker).

Maturi, The Workforce Lure: Education/Training Carries More Weight in Siting Decisions, Industry Week, May 16, 1994, pp. 65–68 (Maturi).

M. Maurice, F. Sellier, & J. Silvestre, The Social Foundations of Industrial Power: A Comparison of France and Germany (1986).

Mikulecky, Job Literacy: The Relationship Between School Preparation and Workplace Actuality, 17 Reading Research Quarterly 400 (1982).

Mikulecky & Ehlinger, The Influence of Metacognitive Aspects of Literacy on Job Performance of Electronics Technicians, 18 J. Reading Behavior 41 (1986).

MIT Commission on Industrial Productivity, Education and Training in the United States: Developing the Human Resources We Need for Technological Advance and Competitiveness, in 2 Working Papers of the MIT Commission on Industrial Productivity (1989) (MIT).

Mitchell, The Impact of International Trade on U. S. Employment, in American Labor in a Changing World Economy 5 (W. Morehouse ed. 1978).

Morgan & Sirageldin, A Note on the Quality Dimension in Education, 76 J. Pol. Econ. 1069 (1968).

National Academy of Education, Economic Dimensions of Education (1979).

National Center on Education and the Economy, America's Choice: High Skills or Low Wages! (1990) (National Center).

642

National Commission on Excellence in Education, A Nation at Risk 8–9 (Apr. 1983).

National Commission on Jobs and Small Business, Making America Work Again: Jobs, Small Business, and the International Challenge (1987).

National Governor's Association, Making America Work 35–36, 77–96 (1987).

National Institute of Justice, Research in Brief, J. Toby, Violence in Schools 3 (Dec. 1983).

National School Safety Center, Weapons in Schools (May 1989).

Neef & Kask, Manufacturing Productivity and Labor Costs in 14 Economies, Monthly Labor Review, Dec. 1991, p. 24 (Neef & Kask).

Neff, Recharging U. S. Competitiveness: Perhaps We Should Use Germany's Education System as a Benchmark, Industry Week, Jan. 20, 1992, p. 21.

O'Connor, Education's Significance as Quality-of-Life Location Factor Parallels Nationwide Reformist Movement, Site Selection Handbook, Aug. 1988, p. 846.

M. O'Donoghue, Economic Dimensions in Education (1971).

Organisation for Economic Co-operation and Development, Education and the Economy in a Changing Society (1989).

Overman, Skilled States Lure New Business, HRMagazine, Jan. 1994, pp. 61–62 (Overman).

Packer, Taking Action on the SCANS Report, Educational Leadership, Mar. 1992, p. 27.

R. Perlman, The Economics of Education: Conceptual Problems and Policy Issues (1973).

R. Price, Fighting Violence with 'All the Mushy Stuff,' USA Today, May 9, 1994, p. 9A.

D. Prothrow-Stith & M. Weissman, Deadly Consequences (1991).

G. Psacharopoulos, Returns to Education: An International Comparison (1973).

M. Rasell & E. Appelbaum, Investment in Learning: An Assessment of the Economic Return (1992).

Ray & Mickelson, Corporate Leaders, Resistant Youth, and School Reform in Sunbelt City: The Political Economy of Education, 37 Social Problems 178 (1990).

R. Reich, The Work of Nations (1991).

D. Riddle, Service-Led Growth: The Role of the Service Sector in World Development (1986).

W. Rorabaugh, The Craft Apprentice: From Franklin to the Machine Age in America (1986) (Rorabaugh).

Rumberger & Daymont, The Economic Value of Academic and Vocational Training Acquired in High School, in Youth and the Labor Market 157 (M. Borus ed. 1984).

Ruttenberg, The Limited Promise of Public Health Methodologies to Prevent Youth Violence, 103 Yale L. J. 1885 (1994).

Ryscavage & Henle, Earnings Inequality Accelerates in the 1980's, Monthly Labor Review, Dec. 1990, p. 3.

T. Schultz, Education and Productivity (report prepared for the National Commission on Productivity, 1971).

Schultz, Investment in Human Capital, American Economic Review, Mar. 1961, p. 3, reprinted in 1 Economics of Education 13 (M. Blaug ed. 1968) (Schultz (1961)).

S. Seninger, Labor Force Policies for Regional Economic Development: The Role of Employment and Training Programs (1989).

R. Seybolt, Apprenticeship & Apprenticeship Education in Colonial New England & New York (1917) (Seybolt).

Sheley, McGee, & Wright, Gun-Related Violence in and Around Inner-City Schools, 146 Am. J. Diseases in Children 677 (1992) (Sheley, McGee, & Wright).

644

Stone & Boundy, School Violence: The Need for a Meaningful Response, 28 Clearinghouse Review 453 (1994).

Strane, Locating in Rural America Could be a Competitive Advantage, 12 Telemarketing, Oct. 1993, p. 92.

R. Sturm, How Do Education and Training Affect a Country's Economic Performance? A Literature Survey (1993).

A Survey of The Global Economy, The Economist, Oct. 1, 1994, p. 37 (Survey of Global Economy).

Swaim & Podgursky, Do More-Educated Workers Fare Better Following Job Displacement?, Monthly Labor Review, Aug. 1989, p. 43.

Tremblay, The Impact of School and College Expenditures on the Wages of Southern and Non-Southern Workers, 7 J. Labor Research 201 (1986).

J. Vaizey, The Economics of Education (1973).

J. Vaizey, The Political Economy of Human Capital (1973).

Vallens, Global Economy May Dictate More Spending for Training, Modern Plastics, Nov. 1993, p. 19.

Wachtel, The Effect on Earnings of School and College Investment Expenditures, 58 Review of Economics & Statistics 326, 330 (1976).

Weiner & Siler, Trained to Order, Forbes, June 26, 1989, pp. 73–78.

L. Wheat, Urban Growth in the Nonmetropolitan South 65 (1976).

Wirth, Education and Work: The Choices We Face, Phi Delta Kappan, Jan. 1993, p. 361.

A. Wirth, Education and Work for the Year 2000 (1992).

L. Wise, Labor Market Policies and Employment Patterns in the United States 50 (1989).